Tracy MAYER, as Next Friend of Tyler Lee Mayer, a Minor, Diane Messimer, Individually and as Personal Representative of the Estate of Shaun Messimer, Deceased, and Kathleen and Salvatore M. Ciaramitaro, Individually and as Personal Representatives of the Estate of Michael Ciaramitaro, Deceased, Appellants

v.

WILLOWBROOK PLAZA LIMITED PARTNERSHIP d/b/a Willowbrook Plaza, PPG Venture I Limited Partnership, ERMC, ERMC LP, ERMC LP d/b/a ERMC Security, ERMC II, LP d/b/a ERMC Security, CBL/GP, Inc., CBL & Associates, Inc., CBL & Associates Properties, Inc., CBL & Associates Limited Partnership, and CBL & Associates Management, Inc., Appellees.

No. 14–07–00358–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 19, 2009.

Brad Beers, Craig Lewis, Houston, TX, for appellants.

H. Dwayne Newton, William C. Book, Jr., William Book, Leann Kay, Houston, TX, for appellees.

Panel consists of Chief Justice HEDGES, Justice BOYCE and Senior Justice PRICE.*

## OPINION

WILLIAM J. BOYCE, Justice.

This appeal addresses defense summary judgments granted in wrongful death and survival actions brought by appellants, Tracy Mayer, as next friend of Tyler Lee Mayer, a minor; Diane Messimer, individually and as personal representative of the estate of Shaun Messimer, deceased; and Kathleen and Salvatore M. Ciaramitaro, individually and as personal representatives of the estate of Michael Ciaramitaro, deceased. We affirm.

### Overview

Syna John Heng shot and killed Michael Ciaramitaro and Shaun Messimer after a confrontation in the parking lot of the Willowbrook Plaza shopping center in the

early morning hours of February 2, 2003. The decedents' family members filed wrongful death and survival actions against numerous defendants including ERMC II, LP ("ERMC II"); Willowbrook Plaza Limited Partnership d/b/a Willowbrook Plaza ("Willowbrook Plaza"); PPG Venture I Limited Partnership ("PPG Venture"); and CBL & Associates Management, Inc. ("CBL"). *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 71.002, 71.021 (Vernon 2008). They predicated their actions on a negligent activity theory and a premises defect theory.

ERMC II provides security for the shopping center. Willowbrook Plaza owns the land. PPG Venture owns the buildings and improvements. CBL manages the shopping center and serves as its leasing agent.

The trial court granted summary judgment in favor of the defendants. Appellants contend the trial court erred in granting summary judgment because defendants failed to negate appellants' negligent activity theory as a matter of law.[1] With respect to their premises defect claim, appellants contend that defendants failed to (1) establish that the shooting was not foreseeable; (2) establish that decedents were not invitees or licensees; (3) negate the necessary elements to establish liability for claims by invitees or licensees; and (4) establish that decedents were trespassers.

### Factual Background

Ciaramitaro and Messimer worked at Babin's Seafood House restaurant in the Willowbrook Plaza shopping center. After

---

\* Senior Justice Frank C. Price sitting by assignment.

1. In a separate issue, appellants also contend that ERMC II failed to establish that it satisfied its duty to exercise ordinary care. Because this argument is subsumed within appellants' negligent activity argument, we will address it in conjunction with the negligent activity analysis.

completing their shifts around midnight, Ciaramitaro and Messimer drove to a Bennigan's restaurant located in the Willowbrook Plaza shopping center across the parking lot from Babin's. They socialized with Torry Davison and Monica Valadez at Bennigan's. About two hours later, the four left Willowbrook Plaza shopping center together in Davison's car and drove to a party at the Omni Hotel. They left Ciaramitaro's and Messimer's cars behind in the Willowbrook Plaza parking lot.

The group returned to the Willowbrook Plaza parking lot between 4:00 a.m. and 5:00 a.m. on February 2, 2003 to retrieve the cars they had left. ERMC II did not patrol the parking lot at this time. Under the contract signed by ERMC II and CBL, ERMC II patrolled the shopping center parking lot only during "normal business hours." The shopping center's "normal business hours" did not extend past Bennigan's 2:00 a.m. closing time.

As Davison pulled into the parking lot, he observed 18–year–old Syna John Heng sitting in the driver's seat of Messimer's car. Heng's car was parked next to Messimer's car. Davison drove up to Messimer's car; Davison, Ciaramitaro, Messimer and Valadez then exited Davison's car. Davison grabbed a softball bat from his trunk while Messimer walked over to his car. The driver's side window of Messimer's car had been broken, and Heng was sitting in the driver's seat attempting to start the car. Messimer pulled Heng out of his car and began punching him. Messimer and Heng exchanged words as Messimer continued punching Heng. Messimer knocked Heng to the ground several times.

During the confrontation between Messimer and Heng, 14–year–old Avignon Yin had been sitting in Heng's car. Yin exited Heng's car and stood passively while Ciaramitaro and Davison watched him closely.

Messimer later grabbed Yin and punched him several times.

While Messimer was punching Heng, Davison used the softball bat to break a window of Heng's car. Messimer eventually stopped punching Heng and proceeded to smash the windows, kick the fenders, tear off the plastic bumper, and slash the tires of Heng's car. Messimer took Heng's and Yin's wallets, removed their identification cards, and handed the wallets to Valadez. Finally, Messimer told Heng and Yin to leave on foot. Heng and Yin walked around Bennigan's, out of the group's view.

After Heng and Yin left, Messimer used his cell phone to call his grandmother and tell her about the incident. Ciaramitaro began removing the wheel rims and tires from Heng's car. Davison removed the CD player from Heng's car and put it in his own car.

Heng returned with a handgun approximately three minutes after leaving, walked up to Messimer, and shot him in the chest. Messimer fell to the ground and attempted to crawl away. Heng followed and shot him again in the back. As Davison and Valadez ran for cover, Ciaramitaro ran to his car and got inside. Heng walked over to Ciaramitaro's car and shot him through the window three times. Davison used his cell phone to call 9–1–1 while hiding in the bushes.

Heng then approached Valadez, who was crouching on the opposite side of Messimer's car; pointed his gun at her; and demanded his wallet. Finding his identification missing from his wallet, Heng demanded that Valadez give it to him. Valadez told Heng that she did not have his identification. Heng searched Messimer's car and the ground outside the car, but did not find the identification. Heng and Yin then got into Heng's car and drove away on the rims. Police arrived moments la-

ter. Heng and Yin were arrested and charged in connection with the deaths of Messimer and Ciaramitaro.

## Procedural Background

On December 29, 2004, Tracy Mayer, as next friend of Tyler Lee Mayer, a minor, and Diane Messimer, individually and as personal representative of the estate of Shaun Messimer, deceased, filed a wrongful death and survival action asserting negligence and gross negligence against multiple parties including the above-named appellees. Kathleen and Salvatore M. Ciaramitaro, individually and as personal representatives of the estate of Michael Ciaramitaro, deceased, also filed a wrongful death and survival action against multiple parties including the above-named appellees on January 25, 2005, alleging that appellees' negligence caused the decedents' deaths.

Mayer and Diane Messimer filed their second amended petition on June 21, 2006. They effectively nonsuited all previously named defendants—except, as relevant to this case, Willowbrook Plaza Limited Partnership, CBL/GP, Inc., PPG Venture I Limited Partnership, ERMC, ERMC II, LP, and CBL & Associates Management, Inc.—by deleting them from their live pleading. *See Randolph v. Walker*, 29 S.W.3d 271, 274 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) ("When a party's name is omitted from an amended pleading, he is as effectively dismissed as where a formal order of dismissal is entered.") (internal citations omitted); *Wren v. Tex. Employment Comm'n*, 915 S.W.2d 506, 508 (Tex.App.-Houston [14th Dist.] 1995, no writ) ("Dropping a defendant from a pleading serves to nonsuit that defendant."). Mayer and Diane Messimer

pleaded both premises defect and negligent activity claims.

The Ciaramitaros filed their third amended petition on June 13, 2006. They, too, effectively nonsuited all previously named defendants—except, as relevant to this appeal, Willowbrook Plaza Limited Partnership, PPG Venture I Limited Partnership, ERMC II, LP d/b/a ERMC Security, and CBL & Associates Management, Inc.—by deleting them from their live pleading. *See Randolph*, 29 S.W.3d at 274; *Wren*, 915 S.W.2d at 508. The Ciaramitaros pleaded both premises defect and negligent activity claims.

CBL, CBL/GP, Inc., ERMC, and ERMC II filed combined traditional and no-evidence summary judgment motions. PPG Venture and Willowbrook Plaza filed no-evidence summary judgment motions. After appellants responded to the summary judgment motions, CBL, ERMC, ERMC II, Willowbrook Plaza, and PPG Venture filed a reply.

On January 16, 2007, the trial court signed orders granting (1) Willowbrook Plaza's no-evidence summary judgment motion; and (2) CBL/GP, Inc.'s and CBL's combined traditional and no-evidence summary judgment motions. On January 18, 2007, the trial court signed orders granting (1) ERMC and ERMC II's combined traditional and no-evidence summary judgment motion; and (2) PPG Venture's no-evidence motion for summary judgment.

The trial court signed an order on March 19, 2007, severing and abating appellants' claims against Syna John Heng and Avignon Yin. This severance order made the trial court's prior summary judgment orders final and appealable. *See, e.g., Park Place Hosp. v. Milo*, 909 S.W.2d 508, 510 (Tex.1995). Appellants timely appealed.[2]

---

**2.** Appellants identify the appellees in their

brief as ERMC, ERMC LP, ERMC LP d/b/a

## Standard of Review

An appellate court applies *de novo* review to a grant of summary judgment, using the same standard that the trial court used in the first instance. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). A party may move for a traditional summary judgment after the adverse party has appeared or answered, and may move for a no-evidence summary judgment after an adequate time for discovery has passed. Tex.R. Civ. P. 166a(a), (i).

A traditional summary judgment may be granted if the motion and evidence show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). In reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006). The movant must establish entitlement to summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of the cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

A no-evidence motion for summary judgment must be granted if (1) the moving party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof at trial; and (2) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements. *See* Tex.R. Civ. P. 166a(i). In reviewing a no-evidence motion for summary judgment, we view all of the summary judgment evidence in the light most favorable to the non-movant, "crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006). The non-moving party is not obligated to marshal its proof, but it is required to present evidence that raises a genuine fact issue on the challenged element. *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002).

## Analysis

### A. Overview of Governing Legal Standards

#### 1. Wrongful Death and Survival Actions

Appellants sued appellees for wrongful death and survival claims arising from the February 2, 2003 shooting deaths of Ciaramitaro and Messimer at the shopping center.

Under the Wrongful Death Act, a decedent's beneficiaries may bring an action if the decedent would have been entitled to bring an action for the injury had the decedent lived. Tex. Civ. Prac. & Rem.

ERMC Security, ERMC II, LP d/b/a ERMC Security, ERMC II, LP, CBL/GP, Inc., CBL & Associates, Inc., CBL & Associates Properties, Inc., CBL & Associates Limited Partnership, CBL & Associates Management, Inc., Willowbrook Plaza Limited Partnership d/b/a Willowbrook Plaza, and PPG Venture I Limited Partnership. The proper appellees on appeal are ERMC, ERMC II, LP d/b/a ERMC Security, CBL & Associates Management, Inc., CBL/GP, Inc., Willowbrook Plaza Limited Partner-ship, and PPG Venture I Limited Partnership. These entities were sued in appellant's live pleadings; captured in the severance order that made the summary judgment orders final and appealable; and then named in the notice of appeal. Because appellants do not pursue claims against ERMC and CBL/GP, Inc., on appeal, we address only the claims against ERMC II, CBL, Willowbrook Plaza, and PPG Venture.

Code Ann. §§ 71.003(a), 71.004 (Vernon 2008). To advance a wrongful death claim, a plaintiff must be a child, parent, or the spouse of the decedent. *Id.* § 71.004. Wrongful death claimants sue to recover their own damages resulting from the decedent's death. *See id.* § 71.004; *Goode v. Shoukfeh,* 863 S.W.2d 547, 551 (Tex.App.-Amarillo 1993, no writ).

Section 71.021 provides for the survival of a cause of action by which a decedent may have sought recovery for personal injuries, pain and suffering, and other damages suffered before death. *Id.* § 71.021 (Vernon 2008); *Goode,* 863 S.W.2d at 551. Survival claims are "wholly derivative" of a decedent's rights. *Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 345 (Tex.1992). A survival action does not create a new cause of action; it merely permits the decedent's cause of action to survive the decedent's death. *Kramer v. Lewisville Mem'l Hosp.* 858 S.W.2d 397, 404 (Tex.1993).

As part of their statutory wrongful death and survival claims, appellants must establish that a wrongful act occurred. *McCullough v. Godwin,* 214 S.W.3d 793, 805 (Tex.App.-Tyler 2007, no pet.); *see also* Tex. Civ. Prac. & Rem.Code Ann. §§ 71.002(b), 71.021. Appellants contend there are two wrongful acts at issue here: (1) negligent activity, and (2) conduct giving rise to liability for premises defect.

**2. Negligent Activity and Premises Defect**

Negligent activity and premises defect are independent theories of recovery. *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 529 (Tex.1997). Recovery on a negligent activity theory requires injury by or as a contemporaneous result of the activity itself—not a condition created by the activity. *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 753 (Tex.1998); *Keetch v. Kroger Co.,* 845 S.W.2d 262, 264 (Tex. 1992). In contrast, a premises defect theory requires an injury as a result of a condition of the premises. *Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.,* 252 S.W.3d 586, 592 (Tex.App.-Fort Worth 2008, pet. denied).

A plaintiff must establish that the defendant had control over and responsibility for the premises before liability can be imposed. *See County of Cameron v. Brown,* 80 S.W.3d 549, 556 (Tex.2002). The control must relate to the condition or activity that caused the injury. *See Olivo,* 952 S.W.2d at 528.

A complaint that a landowner failed to provide adequate security against criminal conduct by third parties ordinarily is characterized as a premises defect claim. *Timberwalk,* 972 S.W.2d at 753. Duty remains a threshold inquiry in a premises defect claim, and the scope of the duty owed to the claimant depends upon the claimant's status when the incident at issue occurred. *See W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005); *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). Claimants traditionally have been classified as invitees, licensees, or trespassers. *Dukes,* 252 S.W.3d at 592.

An invitee enters land with the owner's knowledge and for the mutual benefit of both. *Am. Indus. Life Ins. Co. v. Ruvalcaba,* 64 S.W.3d 126, 134 (Tex. App.-Houston [14th Dist.] 2001, pet. denied). This category focuses on whether a claimant had present business relations with the owner or possessor of land at the time of injury that would make the claimant's presence of mutual benefit. *Id.* at 135. A claimant who was an invitee or had permission to enter a particular portion of land can become a mere licensee or trespasser by using property on a personal

venture beyond the invitation's scope. *Burton Constr. & Shipbuilding Co. v. Broussard*, 154 Tex. 50, 273 S.W.2d 598, 603 (1954); *see also Peerenboom v. HSP Foods, Inc.*, 910 S.W.2d 156, 161 (Tex. App.-Waco 1995, no writ).

A licensee enters and remains on land with the owner's consent and for the licensee's own convenience, or on business with someone other than the owner. *Ruvalcaba*, 64 S.W.3d at 134. In contrast to invitees, licensees enter the premises solely for their own purposes. *Peerenboom*, 910 S.W.2d at 163. Absent a relationship inuring to the mutual benefit of the claimant and the owner, a claimant is classified as a licensee. *Id.* A licensee who exceeds the rights and privileges granted by the license becomes a trespasser. *Burton*, 273 S.W.2d at 603; *see also Peerenboom*, 910 S.W.2d at 163 (off-duty employee lost licensee status on employer's property and was a trespasser at the time of injury because she entered an area of property beyond the scope of employer's permission).

A trespasser enters another's property without lawful authority, permission, or invitation. *Ruvalcaba*, 64 S.W.3d at 134.

The scope of the duty owed in a premises defect case varies according to the claimant's status as invitee, licensee, or trespasser. An owner or occupier of land must use reasonable care to protect an invitee from known conditions that create an unreasonable risk of harm and conditions that should be discovered by the exercise of reasonable care. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000); *Ruvalcaba*, 64 S.W.3d at 134. An owner or occupier of land must refrain from injuring a licensee willfully, wantonly, or through gross negligence; the owner or occupier who has actual knowledge of a

dangerous condition unknown to the licensee must warn of or make safe the dangerous condition. *Ruvalcaba*, 64 S.W.3d at 134. The only duty a premises owner or occupier owes to a trespasser is the duty not to cause injury willfully, wantonly, or through gross negligence. *Tex. Utils. Elec. Co. v. Timmons*, 947 S.W.2d 191, 193 (Tex.1997); *Ruvalcaba*, 64 S.W.3d at 135.

**B. Application of Governing Legal Standards**

**1. Negligent Activity**

We begin by addressing appellants' negligent activity theory as a potential basis for the wrongful act necessary to pursue their wrongful death and survival actions.

**a. ERMC II**

Although appellants pleaded both a negligent activity theory and a premises defect theory against security company ERMC II in the trial court, appellants disclaim on appeal any reliance on premises defect against ERMC II. Therefore, we address only the negligent activity theory.

The trial court correctly granted summary judgment to ERMC II on the negligent activity claim because ERMC II was engaged in no activity—negligent or otherwise—when the decedents encountered Heng in the shopping center parking lot. It is undisputed that ERMC II's parking lot patrol hours did not extend to the period between 4:00 a.m. and 6:00 a.m.; all tenants were closed at that time. It is undisputed that ERMC II was not contractually required to patrol at that time.

Appellants seek to establish a negligent activity by positing that the absence of early morning parking lot patrols violated a duty of care in the provision of security services. However, security companies such as ERMC II owe no generalized duty to provide security services beyond their contract terms. *See Banzhaf v.*

*ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 186 (Tex.App.-Eastland 2000, pet. denied).

In *Banzhaf,* two employees of a sporting goods store were injured during a daytime store robbery. *Id.* at 183. ADT Security Systems Southwest, Inc., provided the store's alarm system, which was designed to be activated only when the store was closed and empty of all employees. *Id.* at 184. ADT did not provide daytime monitoring services and never responded to daytime security matters at the store. *Id.*

The store employees sued ADT and alleged several theories to support their contention that ADT owed a duty to protect them against criminal acts by third parties. *Id.* at 185. They claimed that ADT owed a contractual duty to the victims that "is premised on an assumption that ADT's being in the security business required it to protect [the store's] employees." *Id.* The court concluded that ADT provides security services only pursuant to contracts with its customers. *Id.* The store selected the limited services it wished ADT to provide; nothing in the contract created a duty to provide security services beyond those selected. *Id.*

The employees also contended that ADT owed a duty under tort principles because (1) ADT had a duty to prevent foreseeable crimes as a security company; and (2) violent crime against the employee victims was foreseeable to those in the security business. *Id.* at 186. The court refused to create a broad extra-contractual duty for security companies:

> Plaintiffs' argument would shift the responsibility for protection against crime, without any contractual basis, from law enforcement agencies to security companies. Purchasers are free to contract for the particular security devices and services that they consider to be necessary. We are not aware of any case extending the duty of security compa-

nies beyond their contracts as suggested by plaintiffs, nor have plaintiffs cited any. ADT owed no duty to plaintiffs based on tort principles.

*Id.*

*Banzhaf's* analysis applies with equal force here. ERMC II's contract required it to provide security only during "normal business hours." The contract states that "[ERMC II] agrees to provide the following which are subject to review and approval by CBL: ... (a) work schedule providing for sufficient coverage both inside and outside the premises during its normal business hours." Deposition testimony establishes that the shopping center's "normal business hours" did not extend past 2:00 a.m., when the last tenant closed. Because ERMC II was not obligated to patrol the parking lot or provide security beyond the time limit in its contract, ERMC II owed no duty to provide security when the decedents encountered Heng between 4:00 a.m. and 5:00 a.m. on February 2, 2003.

Appellants assert that *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 295 (Tex.2004), "affirmatively establishes that an independent contractor, retained by the owner to provide security services, has a duty to the plaintiff to conduct the security activities with ordinary care." Appellants further argue that "applying [*Khan* ] to the facts of this case establishes that ERMC II had the duty to exercise ordinary care with respect to the security services it was providing" at the shopping center. Appellants misplace their reliance on *Khan.*

In *Khan,* Mohammed Khan was employed by La Sani, Inc., at a gas station La Sani operated pursuant to a lease and dealer agreement with Shell Oil Company. *Id.* at 291. He was shot while cleaning the service-bay areas during his night shift. *Id.* Khan sued Shell for negligence and

asserted that Shell had a right to control several security-related matters at the gas station, even though the dealer agreement stated that La Sani was an independent contractor and Shell had no right to control operations. *Id.* at 292

*Khan* addressed Shell's liability for Khan's shooting based on Shell's overlapping roles as premises owner and employer of an independent contractor. *Id.* at 291. To provide a backdrop for the case and express its limited application, the court began by stating:

> Once again, we consider when an oil company may be held responsible for crimes committed by third parties against an employee of a lessee-dealer. In *Exxon v. Tidwell,* [867 S.W.2d 19, 20 (Tex.1993),] we held the answer 'depends on whether the oil company possessed a right of control over the safety and security of the station.' As we were adopting a new standard, we remanded for a new trial so the parties could present evidence directed to that standard. In this case, we apply that standard to the evidence presented. Concluding there is no evidence the oil company here had a right to control security or premises conditions at the station, we reverse the court of appeals' judgment....

*Id.* (internal footnotes omitted).

The court noted that Shell, like Exxon, had overlapping roles and duties as (1) premises owner pursuant to a lease, and (2) employer of an independent contractor pursuant to a dealer agreement. *Id.* After analyzing whether Shell had a right of control over the safety and security of the gas station, the court held that Shell had no such right and owed no duty of care to Khan. *Id.* at 295.

Because the relationship between an oil company and the station lessee is controlled by a lease and a dealer agreement,

the legal standards governing an oil company's tort liability for injury to lessee employees arise from an amalgam of landlord-tenant and agency principles. *See Tidwell,* 867 S.W.2d at 20–21. A duty to the tenant attaches when the landlord has the right of control over the leased premises; therefore, the landlord owes the same duty of care to a tenant's employee. *Id.* at 21. Further, employers have a duty of ordinary care under the principles of agency law to provide a safe workplace. *Id.* One who retains the right of control over the work of an independent contractor also owes a duty of reasonable care to the contractor's employees. *Id.* The court concluded that these principles gave rise to "a hybrid body of law ... governing oil companies and their service station lessees." *Id.* Consequently, the court held that whether an oil company owes a duty of ordinary care to protect a lessee's employees from third-party criminal acts depends on whether the oil company possesses a right of control over the safety and security of the station. *Id.*

Viewed against this backdrop, *Khan's* application of the "hybrid" principles "governing oil companies and their service station lessees" addressed a different issue focusing on whether Shell owed a duty of care to its lessee's employee. Unlike Shell, ERMC II did not have overlapping roles as premises owner and employer of an independent contractor. Unlike La Sani, ERMC II was not the decedents' employer. ERMC II was neither the premises owner nor the decedents' employer. We conclude that *Khan* does not control.

*Banzhaf's* analysis is the better fit here. *Banzhaf* confirms that security companies owe no generalized tort duty to the victim of third party criminal acts beyond the governing contract terms. *See Banzhaf,* 28 S.W.3d at 185–86. Accordingly, we

hold that the trial court correctly granted ERMC II's summary judgment motion.

### b. Willowbrook Plaza, PPG Venture, and CBL

■ We similarly hold that the trial court correctly granted summary judgment to Willowbrook Plaza, PPG Venture, and CBL because there was no ongoing activity by these appellees—negligent or otherwise—when the decedents returned to the shopping center parking lot between 4:00 a.m. and 5:00 a.m. on February 2, 2003.

Additionally, we are not persuaded by appellants' contention that *Khan* is applicable to these appellees. Appellants assert that *Khan* "has set forth the rule of law and the standards to be applied in cases such as this where a plaintiff (who is a tenant's employee) is criminally assaulted on the owner's property, and where the landlord-owner has contracted to provide security services." For the reasons discussed above, *Khan* does not apply here because it focused on the "hybrid body of law" governing the particular relationship between oil companies and gas station lessee-dealers. And, in further contrast to *Khan*, the decedents were not harmed by third-party criminal activity at a time they were working as tenant employees. They indisputably were off duty when they returned to the parking lot and had been off duty for at least four hours.

■ As the Texas Supreme Court has observed, claims predicated on an alleged failure to provide adequate protection against criminal conduct by third parties ordinarily are analyzed in terms of a premises defect rather than negligent activity. *Timberwalk*, 972 S.W.2d at 753. The ordinary rule applies here. We conclude that

appellants cannot prevail on a negligent activity theory as a matter of law, and therefore cannot establish the necessary wrongful act to pursue their wrongful death and survival actions on that basis. We overrule appellants' issues involving arguments based on a negligent activity theory of liability.

### 2. Premises Defect

Having determined that appellants cannot establish liability under a negligent activity theory, we turn to appellants' premises defect theory against Willowbrook Plaza, PPG Venture, and CBL.[3]

### a. Decedents' status

■ The parties vigorously contest whether the decedents were invitees when the shooting occurred. The test for determining invitee status is whether the decedents had present business relations with the appellees at the time of injury that made their presence of mutual benefit. *See Ruvalcaba*, 64 S.W.3d at 135. Based on the record before us, we conclude as a matter of law that the decedents were not invitees when the shooting occurred.

It is undisputed that the decedents were invitees when they originally parked their cars in the shopping center lot before beginning their shift as employees at Babin's, and when they parked their cars to visit Bennigan's as patrons. It is undisputed that the decedents left the shopping center parking lot with Davison and Valadez about two hours after arriving at Bennigan's to attend a party offsite at the Omni Hotel. It also is undisputed that no tenants were open when the decedents returned to the shopping center parking lot to retrieve their cars between 4:00 a.m. and 5:00 a.m.

---

**3.** Appellants disclaim on appeal the applicability of a premises defect theory against security company ERMC II. Therefore, we do not address premises defect with respect to ERMC II.

Davison and Valadez testified that neither they nor the decedents intended to conduct business at the shopping center upon returning to the parking lot that morning.

Specifically, Davison testified:

COUNSEL: And at the time you returned, as I understand it, none of the businesses there in the shopping center were open?

DAVISON: Not for—Yeah, you're right; they weren't open.

COUNSEL: And you guys were not returning with the expectation of doing business there at the shopping center either as an employee or as a customer of any business there?

DAVISON: Yes.

COUNSEL: Yes, you were not planning to do business?

DAVISON: Yes, correct.

COUNSEL: You guys were simply planning, as I understand it, to come back and pick up the cars; and then everyone was going to leave at that point?

DAVISON: That's correct.

Valadez testified as follows:

COUNSEL: When you guys left Bennigan's at 1:30 that evening, I take it all of your business purposes for being at Willowbrook Plaza were over?

VALADEZ: Yes.

COUNSEL: You didn't have any other business at the shopping center at that point, I take it?

VALADEZ: No, sir.

COUNSEL: All right. And then when y'all came back then at about 4:30 or 5:00 o'clock that morning, what was your intention? Were y'all just going to get in your cars and leave?

VALADEZ: Yes, sir.

COUNSEL: You did not have any business purpose for being there at 5:00 o'clock that morning, I take it?

VALADEZ: No.

* * *

COUNSEL: The Bennigan's closed at 2:00 o'clock in the shopping center; right?

VALADEZ: Correct.

COUNSEL: Around 2:00?

VALADEZ: Correct.

COUNSEL: There wasn't any other business in the shopping center that stayed open after that as far as you knew; was there?

VALADEZ: No.

* * *

COUNSEL: And so when you guys got ready to leave at about 1:30, almost all of the businesses in the shopping center were closed at that point except for Bennigan's ... ?

VALADEZ: Yes.

COUNSEL: And I guess it's fair to say that the shopping center was getting pretty deserted by the time you guys left?

VALADEZ: Yes.

This testimony confirms that the decedents' only purpose for returning to the Willowbrook Plaza parking lot between 4:00 a.m. and 5:00 a.m. was to retrieve their cars. They were not invited onto the property at that time, nor was there any economic benefit to the shopping center or its tenants from their presence at that time. *See Cowart v. Meeks*, 131 Tex. 36, 111 S.W.2d 1105, 1107 (1938); *Ruvalcaba*, 64 S.W.3d at 135; *cf. Boss v. Prince's Drive-Ins*, 401 S.W.2d 140, 142 (Tex.Civ. App.-Waco 1966, writ ref'd n.r.e.) (assault victim who was attacked in restaurant parking lot after returning to retrieve a car left there earlier was not an invitee;

victim "occupied no better status ... than that of a licensee to whom defendant owed no duty to prevent assaults by third persons for reasons personal to them"). Appellants' expert, Forrest Franklin, acknowledged that the decedents' cars were not in the parking lot for any business purpose, and that the decedents had elected to use the parking lot for their own purposes. The decedents had ceased to be invitees by the time they returned to the parking lot between 4:00 a.m. and 5:00 a.m.

■ Appellants offer several arguments to support their assertion that the decedents were invitees when they returned to the parking lot. First, they argue that the decedents were invitees when they first parked in the lot next to Bennigan's; they contend this invitee status continued after they left for the Omni Hotel and remained in effect when they returned. This argument fails because the complaining party's status is determined based on the circumstances existing at the time and place of injury. *Peerenboom*, 910 S.W.2d at 161; *Graham v. Atl. Richfield Co.*, 848 S.W.2d 747, 751 (Tex.App.-Corpus Christi 1993, writ denied). Consequently, the decedents' status is determined by the circumstances existing when they returned to the parking lot between 4:00 a.m. and 5:00 a.m. The undisputed testimony establishes that any invitee status they may have had earlier in the evening ceased by the time they returned because there was no mutual business purpose for their presence in the nearly deserted parking lot of a completely closed shopping center.

Appellants also argue that the decedents were invitees because economic benefits inured to appellees from having cars left parked in the lot overnight. The testimony of Davison and Valadez defeats this assertion. Their testimony confirms that no economic benefit accrued from the presence at a closed mall of cars belonging to individuals who had no business purpose for being in the parking lot between 4:00 a.m. and 5:00 a.m.

■ Appellants further argue that the decedents were invitees when they were shot because it was foreseeable that patrons of tenant businesses would leave their cars in the lot overnight. This argument fails because foreseeability of entry is not the standard for determining whether an individual is classified as an invitee. *See Cowart*, 111 S.W.2d at 1107; *Ruvalcaba*, 64 S.W.3d at 135.

Finally, appellants argue that the decedents were invitees because they were employed by Babin's, a tenant of Willowbrook Plaza shopping center. However, when the decedents left Babin's after their shift ended and moved to Bennigan's to socialize with friends, they ceased to be invitees based on their status as employees of Babin's. *See Peerenboom*, 910 S.W.2d at 162–63 (employee lost invitee status on employer's premises when shift ended). And even if it is assumed that the decedents' initial invitee status as employees continued after they ended their shift and began socializing at Bennigan's, that invitee status ended when they left the shopping center and returned because there was no mutual business purpose for their presence in the parking lot between 4:00 a.m. and 5:00 a.m.

On this record, the decedents had ceased to be invitees when the shooting occurred.

### b. Standards governing liability to claimants who are not invitees

Up to this point, the controlling legal principles have been reasonably straightforward. The legal path becomes less clear once it has been established that the decedents were not invitees.

The appellants argue that the decedents at a minimum were licensees, and that the

shooting was foreseeable. For their part, the appellees contend that no premises defect liability attaches regardless of whether the decedents were licensees or trespassers. They contend more broadly that they owed no duty to protect the decedents from criminal conduct by a third party because the shooting was not foreseeable.

■ The conventional formulation of a premises owner's limited duty to protect against criminal acts by third parties is couched in terms of foreseeability.

[F]oreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care on a person who owns or controls premises to protect others on the property from the risk. Once this prerequisite is met, the parameters of the duty must still be determined. Foreseeability is the beginning, not the end, of the analysis in determining the extent of the duty to protect against criminal acts of third parties.

*Timberwalk*, 972 S.W.2d at 756 (internal quotation marks omitted).

■ The *Timberwalk* plaintiff was an invitee, and foreseeability already is incorporated in the duty of care owed to an invitee. *See id.* Unlike the invitee situation, the conventional formulations of the duties owed to licensees and trespassers contemplate something more than mere foreseeability. *See, e.g., Ruvalcaba,* 64 S.W.3d at 134–35. The duty standard for licensees speaks to actual knowledge of the danger. *Id.* at 134; *see State v. Williams,* 940 S.W.2d 583, 584 (Tex.1996) (per curiam). The duty standard for trespassers speaks to intentional, willful, or grossly negligent conduct. *Ruvalcaba,* 64 S.W.3d at 134–35.

And so the question arises: What role does foreseeability play when someone *other than an invitee* seeks to establish liability against a premises owner or occupier based on a third party's criminal conduct?

The Texas Supreme Court addressed this question in *Mellon Mortgage Co. v. Holder,* 5 S.W.3d 654 (Tex.1999) (plurality opinion), but the fractured *Holder* opinion does not provide a clear answer. At least seven justices concluded in *Holder* that foreseeability informs the duty analysis for claimants other than invitees. However, they disagreed about the precise manner in which foreseeability meshes with the non-invitee categories of premises defect claimants.

In *Holder,* an on-duty Houston police officer stopped Holder for an alleged traffic violation late one night and instructed her to follow his squad car. *Id.* at 654. Holder followed the officer for several blocks to an unsecured and deserted parking garage owned by Mellon Mortgage Company. *Id.* There the officer sexually assaulted her in his squad car. *Id.* Holder sued Mellon; the trial court granted summary judgment for Mellon; and the court of appeals reversed. *Id.* The Texas Supreme Court reversed the court of appeals' judgment and rendered judgment for Mellon. *Id.* at 655. The Texas Supreme Court held that Mellon owed no duty to Holder to prevent the attack because it was not foreseeable to Mellon that "a person would be accosted several blocks from Mellon's garage and forced to drive to that garage where she would be sexually assaulted...." *Id.* at 654–55.

Holder's exact status was debated on appeal and in the Texas Supreme Court. The court of appeals majority concluded that she was a licensee at the time of the assault. *Holder v. Mellon Mortgage Co.,* 954 S.W.2d 786, 798 (Tex.App.-Houston [14th Dist.] 1997), *rev'd,* 5 S.W.3d 654 (Tex. 1999). A dissenting opinion concluded that she was a trespasser. *Holder,* 954 S.W.2d at 808 (Hudson, J., dissenting). This dis-

agreement persisted in the Texas Supreme Court. Justice Enoch concluded that Holder was a trespasser. *Holder*, 5 S.W.3d at 661–62 (Enoch, J., concurring). Justice O'Neill, joined by Chief Justice Phillips and Justice Hankinson, concluded that Holder was a licensee. *Id.* at 673 (O'Neill, J., dissenting). A plurality opinion written by Justice Abbott, joined by Justices Hecht and Owen, and a concurring opinion by Justice Baker addressed liability without determining whether Holder was a licensee or a trespasser. *Id.* at 655 (plurality opinion); *see also id.* at 662 (Baker, J., concurring). No justice concluded that Holder was an invitee. *Id.* at 661 (Enoch, J., concurring).

In addressing Mellon's no-duty argument, the plurality opinion applied a threshold foreseeability analysis that did not depend on the plaintiff's status as a licensee or trespasser. *Id.* at 655 (plurality opinion). The plurality opinion divided the threshold foreseeability analysis into two prongs—foreseeability of the crime and foreseeability of the victim—and concluded that the crime was foreseeable but Holder was an unforeseeable victim. *Id.* The plurality opinion therefore concluded that Mellon owed no duty to Holder to prevent the sexual assault. *Id.* at 658. In reaching this conclusion, the plurality opinion disclaimed any intention to abandon the traditional categories used to classify premises defect claimants. *Id.* at 655 n. 3. "Because Holder was an unforeseeable victim regardless of her status, it is unnecessary to determine into which of the three categories she falls." *Id.* at 655.

Justice Baker concurred in the judgment. He, too, applied a threshold foreseeability analysis, but concluded that the crime was not foreseeable. *Id.* at 663–65 (Baker, J., concurring). He rejected the

plurality's focus on foreseeability of the victim. "[R]ather than change the law of duty to add a second-prong foreseeability analysis, we need only consider the *Timberwalk* factors—similarity, proximity, recency, frequency, and publicity—to analyze foreseeability within the duty context as it arises here." *Id.* at 663.

Justice Enoch also concurred in the judgment. He rejected application of foreseeability as a threshold inquiry, and instead applied duty principles tied to the injured party's status. *Id.* at 660–62 (Enoch, J., concurring). He concluded that Holder was a trespasser; that Mellon owed to Holder a duty not to cause her injury intentionally, wilfully, or through gross negligence; and that Mellon conclusively established it had not breached the limited duty it owed to Holder as a trespasser. *Id.* at 662.

In her dissent, Justice O'Neill agreed with Justice Enoch that "the traditional premises liability distinctions govern our analysis." *Id.* at 669 (O'Neill, J., dissenting). The dissent further stated that "the concept of foreseeability in the context of premises liability is embodied in" the classifications of invitee, licensee, and trespasser. *Id.* at 666. After determining that Holder was a licensee, and that Mellon owed to Holder the general duty of care owed to licensees, the dissent concluded that "fact issues exist as to the foreseeability of the risk of criminal conduct in the garage and Mellon's actual knowledge of that risk." *Id.* at 673.

After *Holder*, it is clear that the longstanding classifications of invitee, licensee, and trespasser continue to apply. At least seven of the eight justices who participated in *Holder* agree on this point.[4] The parties to the present appeal do not argue

4. Justice Baker made no reference to the traditional categories; his concurring opinion focuses on foreseeability of the crime. Justice Gonzalez did not participate in the decision.

that the traditional classifications were jettisoned in *Holder* or should be discarded.

Seven of the eight participating justices also appear to agree that foreseeability of the crime must be considered. But it is not clear *how* foreseeability of the crime must be considered. The plurality opinion and Justice Baker's concurring opinion treat foreseeability of the crime as a threshold inquiry that is "complementary, not contradictory, to the traditional premises liability categories." *Id.* at 655 n. 3 (plurality opinion); *see also id.* at 663 (Baker, J., concurring) ("To the extent that the law does impose a duty, foreseeability is the initial analysis."). The dissenters, in contrast, conclude that foreseeability "is embodied in the classifications that have defined a landowner's duty for over one hundred years." *Id.* at 666 (O'Neill, J., dissenting).

■■■■ In the final analysis, there is little practical difference between characterizing foreseeability of the crime as a threshold inquiry or as an implicit concept "embodied" in the traditional invitee, licensee, and trespasser classifications. Foreseeability of the crime must be considered under either characterization. It is a necessary—but not sufficient—condition of liability when licensees or trespassers seek to establish a landowner's liability for third party criminal conduct.

■■■■ When foreseeability of the crime is considered on this record, the trial court's summary judgment must be affirmed because Heng's shooting of Messimer and Ciaramitaro was not foreseeable as a matter of law. *See Trammell Crow Cent. Tex., Ltd. v. Gutierrez,* 267 S.W.3d 9, 15–17 (Tex.2008); *Timberwalk,* 972 S.W.2d at 757–59. This conclusion applies regardless of whether the decedents were licensees or trespassers.

■■■■ In addressing foreseeability of particular criminal conduct on a landowner's property, courts consider whether criminal conduct previously occurred on or near the property;[5] how recently it occurred; how often it occurred; similarity of the previous conduct to the conduct at issue; and the level of publicity given to previous occurrences to indicate that the landowner knew or should have known about them. *Trammell Crow,* 267 S.W.3d at 12, 15; *Timberwalk,* 972 S.W.2d at 757. The occurrence of a significant number of crimes within a short time period strengthens the claim that the particular crime at issue was foreseeable; the occurrence of a few crimes over an extended period negates foreseeability. *Timberwalk,* 972 S.W.2d at 758. Evidence is not considered in hindsight, but rather in light of what the premises owner knew or should have known before the criminal act occurred. *Trammell Crow,* 267 S.W.3d at 15; *Timberwalk,* 972 S.W.2d at 757.

The Texas Supreme Court's recent foreseeability analysis in *Trammell Crow* is instructive. In *Trammell Crow,* Luis Gutierrez and his wife were leaving the movie theater at Quarry Market, a 53–acre mall, after watching a movie. 267 S.W.3d at 11. Luis was shot while walking to their car. *Id.* Luis's family sued Trammell Crow, the mall property manager, claiming that Luis was shot during a botched robbery and that Trammell Crow negligently failed to provide adequate mall security. *Id.* at 11–12. A jury returned a verdict in favor of Luis's family. *Id.* at 12. The court of appeals affirmed the trial court's judgment in favor of Luis's family, holding that (1)

---

5. For a landowner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity. *Timberwalk,* 972 S.W.2d at 757.

Trammell Crow owed a duty to Luis as an invitee; and (2) sufficient evidence supported the jury's finding that Trammell Crow breached its duty. *Id.* On petition for review, Trammell Crow argued that it owed no duty because the shooting was unforeseeable. *Id.*

The court noted that 227 crimes had been reported at Quarry Market in the two years before Luis's death. *Id.* at 13. Most were thefts, burglaries, auto thefts, vandalism, and assaults. *Id.* Ten of the 227 crimes—all robberies—were classified as violent. *Id.* "[A]lthough the repeated occurrences of theft, vandalism, and simple assaults at the Quarry Market signal that future property crimes are possible, they do not suggest the likelihood of murder." *Id.* Therefore, the Court limited its "review to the ten instances of violent crime that took place at the Quarry Market during the two years prior to Luis's death." *Id.* Weighing proximity, publicity, recency, frequency, and similarity to determine whether the shooting was foreseeable, the Court held:

> Considering the five factors together, we cannot conclude that Luis's murder was foreseeable. Trammell Crow had knowledge of violent crimes that were committed at the Quarry Market within a reasonable time prior to Luis's death. Nevertheless, these previous crimes were not sufficiently frequent and similar to give rise to a duty in this case. Only four times in two years were robberies committed without a prior demand for property. Only three times in two years was a weapon clearly used to commit a robbery. In those same two years, no weapon had been used to harm someone, no victim had been seriously injured, and in only one case was a victim attacked prior to the accompanying theft. Even viewing the attack on Luis as a robbery, as we presume the jury did, the circumstances of this attack

are extraordinary.... Nothing about the previous robberies committed at the Quarry Market put Trammell Crow on notice that a patron would be murdered as part of a robbery on its premises. Thus, Luis's death was not foreseeable, and Trammell Crow did not have a duty to prevent the attack.

*Id.* at 17.

In this case, appellants argue that Willowbrook Plaza was a dangerous place and that the decedents' death was foreseeable. To establish foreseeability, appellants point to ERMC II's criminal activity incident reports; Houston Police Department on-line crime report data for an area referred to as Beat 5F40; and memoranda from Larry J. Faulkner, ERMC II's security director at Willowbrook Plaza shopping center. Appellants also contend CBL's assistant director of operations, Doug Meeks, admitted that (1) "when CBL took over the management of [the shopping center], it knew that there was a need for security services;" and (2) "burglaries of vehicles can easily escalate into more violent crimes and car thefts can escalate into violent crimes if the owner comes and finds somebody attempting to steal their car." We review this evidence considering the *Timberwalk* foreseeability factors discussed in *Trammell Crow.*

The incident reports for Willowbrook Plaza shopping center show that two violent crimes and one potentially violent crime occurred at the shopping center between October 1, 2001 and February 2, 2003. At 10:00 p.m. on March 2, 2002, a purse was stolen at gunpoint and this crime was recorded as a robbery. At 9:40 p.m. on April 30, 2002, an attempted robbery with a knife was recorded. And at 9:40 p.m. on November 16, 2002, a firearm was discharged at another vehicle; the incident was recorded as deadly conduct

and a potentially violent crime. During this 16–month period, four burglaries and one act of vandalism occurred after 2:00 a.m. No violent crimes occurred after 2:00 a.m.

Faulkner's March 12, 2002 memorandum to ERMC II's regional manager, Jeff Pugh, stated that two businesses had been burglarized between December 2001 and March 2002. Faulkner believed that Pugh knew of these incidents through conversations with Faulkner and Meeks. According to Faulkner's memorandum, Houston police and CBL had been thoroughly involved with all incidents; a gang task force had been at the shopping center; and undercover officers had been working at the shopping center "to help control and arrest those auto burglary offenders." Contrary to appellants' assertion, this memorandum does not show that burglaries associated with gang activity "had escalated to such an extent that Houston Police Department had periodically dispatched its Gang Task Force to the Willowbrook Plaza shopping center."

Appellants also point to Faulkner's April 19, 2002 memorandum to Meeks, claiming that it warned about a lack of security after normal business hours and that "the same criminal element could strike the businesses just as easily between 4am and 6am." The memorandum states:

> Doug,
>
> This new schedule is being presented as a revamping of the 153 available security man-hours for Willowbrook Plaza. The changes are to better serve the tenants of the center. There will be more man-hours spent during the occurrence of the majority of incidents in the center. There are not enough man-hours available to cover the hours from 2am to 6am. The schedule could be pushed to 3am and possibly 4am. If this were to be put in place, the center would not

> have much to gain and will lose some benefits in the earlier hours of security operation. By 2am, the center is virtually closed. The same criminal element could strike the businesses just as easily between 4am and 6am. I do know that the Houston police patrol the center in their routine of the early morning hours.
>
> If you agree with this schedule change, I would like to forward the attached memo to the tenants of Willowbrook Plaza.

Reading the entire memorandum, it is clear that its purpose was to propose a schedule change of security patrols to target the times at which the majority of criminal incidents at the shopping center occurred. Although Faulkner hypothesized that criminal activity after business hours could occur, he clearly stated that "the center would not have much to gain and will lose" security benefits if security was extended to 3:00 a.m. or 4:00 a.m. because "the center is virtually closed" by 2:00 a.m. Reviewing incident reports after the schedule change was implemented, the incidents of auto-related crimes decreased by almost 50 percent. Faulkner's acknowledgment that criminal activity could occur at any time is neither evidence of nor an admission of foreseeability.

Appellants also rely on deposition testimony in which Meeks agreed that CBL "knew that there was a need for security solutions." Meeks testified as follows:

> COUNSEL: When CBL took over the management of Willowbrook Plaza, it knew that there was a need for security solutions, security presence on the property, correct?
>
> MEEKS: Yes, sir.
>
> COUNSEL: The situation was not such that you could simply just rely on the police to take care of things like they would in an average neighborhood or an

average strip center somewhere else in town. [Objections omitted]

MEEKS: Can you repeat that again?

COUNSEL: Sure. If this was some 5,000–square foot strip center down on 1960, it might be enough just to rely upon the average HPD or Precinct 4 patrol or whatever police jurisdiction you're in, correct?

MEEKS: Correct.

COUNSEL: But because you're operating a 42–acre, multi–100,000 square foot center that attracts people from miles around, a reasonable operator of that facility is going to have a different security solution, correct, more than just relying on the local police patrols?

MEEKS: Possibly.

The full context of this deposition testimony reveals that Meeks's testimony related to general management decisions to provide security based on the size of the property. Nothing in the testimony reveals knowledge of any general or specific criminal threats to the property. Rather, Meeks clarified that because of the shopping center's size as a 42–acre, multi–100,000 square foot center, it would not have been enough to rely only on police patrols for security.

Appellants also point to Meeks's alleged admission "that burglaries of vehicles can easily escalate into more violent crimes." Meeks testified as follows:

COUNSEL: Would you agree that burglaries of vehicles can easily escalate into more violent crimes [objections omitted]—if there's a confrontation between people?

MEEKS: Possible.

COUNSEL: Would you agree that it's certainly reasonable to expect that car thefts can escalate into violent crimes if the owner comes and finds somebody stealing their car?

[Objections omitted]

MEEKS: Possible.

COUNSEL: It's not out of the question is it?

MEEKS: No, it's not.

COUNSEL: You read about it happening in the newspaper, don't you?

MEEKS: Yes.

Meeks's testimony demonstrates that he responded "Possible" when asked questions about hypothetical situations. None of the questions asked about specific conditions or circumstances related to Willowbrook Plaza shopping center.

Finally, appellants assert that the incident in this case was "definitely foreseeable" because the Houston Police Department's on-line crime report data for Beat 5F40, which includes Willowbrook Plaza shopping center, shows "there were 34 violent crimes and 902 major crimes in 1998, and from 2000 to 2002, auto-related criminal activity in the same area was increasing significantly from 68 auto-related incidents in 2000 to 126 auto-related criminal activities in 2002." This report was available to CBL.

■ Beat 5F40 includes at least three shopping centers: Willowbrook Plaza, Willowbrook Commons, and Willowbrook Mall. The record does not establish how large a territory Beat 5F40 is and how many square miles it encompasses. Geographic area is an important consideration. For a landowner to foresee criminal conduct on property, the evidence must reveal that "other crimes have occurred on the property or in its immediate vicinity" because distant criminal activity bears less relevance. *Timberwalk,* 972 S.W.2d at 757. The record does not establish that all crimes recorded in Beat 5F40 are in the immediate vicinity of Willowbrook Plaza.

Further, appellants do not explain how 34 violent crimes in 1998 establish foresee-

ability of the incident in February 2003. Appellants also do not explain how an increase in auto-related criminal activity establishes foreseeability of murder. *See Trammell Crow*, 267 S.W.3d at 13 ("although the repeated occurrences of theft, vandalism, and simple assaults at the Quarry Market signal that future property crimes are possible, they do not suggest the likelihood of murder").

The Beat 5F40 crime report data reveal that in the two years before the decedents' murder, five violent crimes occurred after 2:00 a.m. The violent crimes involved three robberies and two aggravated assaults. No murder was recorded for Beat 5F40 until the decedents were shot on February 2, 2003. In *Trammell Crow*, the Court held that 10 robberies in two years were not sufficiently frequent to make it reasonably foreseeable that a patron would be murdered as part of a robbery on its premises. *Id.* at 17. The same conclusion applies to the data in this case.

Appellants contend that appellees, within a reasonable time prior to the decedents' deaths, knew of violent crimes that occurred at Willowbrook Plaza shopping center and the entire area of Beat 5F40, and also knew of the five non-violent crimes that occurred at the shopping center after 2:00 a.m. In the 16 months before the decedents' deaths, two violent crimes were committed at the shopping center; neither occurred after 2:00 a.m. Only five non-violent crimes were committed after 2:00 a.m. when all businesses were closed. There is no evidence that anyone was injured as a result of either the violent or non-violent crimes that occurred at the center. For the entire Beat 5F40 area, only five violent crimes were recorded after 2:00 a.m. No murders occurred on the premises or anywhere in the Beat 5F40 area in the 16 months before the shooting.

Based on *Trammell Crow*, these previous crimes were not sufficiently frequent or similar to make it foreseeable that the decedents would be murdered at the shopping center between 4:00 a.m. and 6:00 a.m. *See id.* Additionally, as in *Trammell Crow*, the circumstances here were "extraordinary" in light of the chain of events that unfolded as Heng was discovered in Messimer's car, beaten, and ordered to leave on foot following the vandalizing of his car before returning to kill the decedents. These circumstances underscore the lack of foreseeability. *Id.*

Having determined that the shooting in this case was not foreseeable, we hold that, as a matter of law, Willowbrook Plaza, PPG Venture, and CBL did not owe the decedents a duty to protect them from Heng's criminal acts. We thus conclude that appellants cannot prevail under a premises defect claim as a matter of law and therefore cannot establish the necessary wrongful act to pursue their wrongful death and survival actions. Accordingly, we hold that the trial court correctly granted summary judgment to Willowbrook Plaza, PPG Venture, and CBL, and we overrule appellants' issues regarding premises defect.

### Conclusion

Because appellants failed to establish a wrongful act under a premises defect theory or a negligent activity theory, they cannot prevail on their wrongful death and survival actions as a matter of law. The trial court correctly granted summary judgment to ERMC II, Willowbrook Plaza, PPG Venture, and CBL. We affirm the trial court's judgment.