# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00786-CV

---

**Appellant, The City of Austin d/b/a Austin Energy // Cross-Appellant, Saljar, Inc. d/b/a OK Corral Night Club**

**v.**

**Appellee, Maria Del Rosario Membreno Lopez as Next Friend of Jaime Antonio Membreno Lopez // Cross-Appellee, The City of Austin d/b/a Austin Energy**

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-15-004371, THE HONORABLE TIM SULAK, JUDGE PRESIDING

---

## O P I N I O N

The City of Austin d/b/a Austin Energy (City) appeals from the trial court's final judgment after the jury returned a verdict against the City in favor of appellee Maria Del Rosario Membreno Lopez as Next Friend of Jaime Antonio Membreno Lopez (Membreno Lopez). In four issues, the City asserts charge error and three evidentiary-sufficiency issues. In its cross-appeal, Saljar, Inc. d/b/a OK Corral Night Club (Saljar) raises four issues, also asserting charge error and three evidentiary-sufficiency issues. For the reasons explained below, we affirm the trial court's judgment.

BACKGROUND

**Factual background**

This case arises from a tragic and fatal accident on a construction site at the OK Corral Night Club in February 2009. Decedent Jaime Membreno was an employee of Luis Romero d/b/a Luis Romero Construction (Romero), working as part of the stucco crew at the construction project.[1] The nightclub is owned and operated by Saljar, whose principals are Ghasson Jason Najjar and Salim Salem. Membreno was fatally injured while standing on a metal scaffold that the stucco crew had erected near the City's power line. Membreno was electrocuted when he contacted the line with a 10-foot roll of metal mesh that he was holding while cutting it with metal wire-cutters.

The power line that Membreno came in contact with had been installed by the City in 1975 after the City obtained an easement in 1972. The power line was on the west side of the property, which is a strip mall. In November 2008, Saljar entered into a lease for space in the shopping center to open a nightclub. Saljar remodeled the building and acted as the general contractor for the remodeling project. Saljar hired Romero to put stucco and mesh "around the front of the building [to] th[e] western side" of the building.

In January 2009, Saljar applied to the City for a construction permit and included a site plan and a sealed architectural drawing that purported to show the planned scope of work. Both documents were inaccurate. The site plan incorrectly described the scope of work, omitting any indication that construction work would be performed on the west side of the building where the power lines are located; instead, it only showed that work would be done on the north side of

---

[1] Membreno was not married, but Jaime Antonio Membreno Lopez, the child upon whose behalf this suit was brought, was born two weeks after Membreno died.

the building where there are no power lines. This omission made the permit application eligible for an expedited review process that would allow the nightclub to open sooner. The sealed architectural drawing did not disclose an overhang along the perimeter of the roof on the west side of the building that extended the building three feet closer to the City's power lines. That overhang on the west side of the building was where Membreno was working when he made contact with the power line.

Romero and his crew, including Membreno, erected a scaffold starting on the west side of the building that wrapped around towards the front door on the north side of the building. Romero testified that when they erected the scaffolding, he, Membreno, and the rest of the stucco crew observed that the power lines were "maybe two feet away . . . from the scaffold" but continued working. It is undisputed that no one contacted the City to request that it de-energize the power lines as required by the Texas Health and Safety Code and that the work was being performed within six feet of the power lines in violation of Texas law and Occupational Safety and Health Administration (OSHA) regulations. *See* Tex. Health & Safety Code §§ 752.003-.004; 29 C.F.R. § 1926.451. In addition, Saljar never scheduled the pre-construction meeting that was a condition of the permit.

Several Austin Energy employees went out to the accident site on the day of the accident, shortly after Membreno's fatal injury.[2] One of them, former Austin Energy Design Supervisor Joe McNair, made a sketch at the site that was the only depiction of the scaffold with measurements that was admitted at trial. In addition, a number of photographs taken of the accident site were admitted into evidence at trial. The photograph below is one of them:

---

[2] Austin Energy is the City department that operates the utility company.



**Procedural background**

Membreno Lopez sued the City for negligence and negligence per se on behalf of her minor child, whom she asserts is Membreno's only child and sole heir.[3] In her live pleading at the time of trial (her ninth amended petition), Membreno Lopez alleged that the City owned and operated the utility poles and the power line. Membreno Lopez also alleged that the City:

- installed the power line "too close to the building where Jaime Membreno was killed";

- "failed to regularly inspect and maintain the poles," and as a result, "the poles began to lean towards the building allowing the high-voltage lines to become dangerously close to the side of the building where the scaffolding was constructed and ultimately where Mr. Membreno was working";

- is "solely responsible" for operating and maintaining the power line and has been since the line's original construction in 1975; and

---

[3] Membreno Lopez filed her suit in 2015 but did not add the City as a defendant until 2017.

- "failed to maintain the electrical distribution line, which allowed it to lean too close to the building where Jaime Membreno was."

Membreno Lopez further alleged that the City was negligent by granting construction permits to Saljar and by not properly inspecting the construction and not de-energizing the power line. In connection with her negligence per se claim, she alleged that the overhead lines violated the National Electrical Safety Code (NESC) standards related to power-line overhead clearances and distances from buildings.

Membreno Lopez also sued Romero, Saljar, Saljar's principals Najjar and Salem, the property manager Stephen Cole, and the property owner and landlord, the Estate of W. H. Bullard (through its independent administrator George J. Vassar), specifically alleging a premises-liability claim against Saljar, Cole, and Vassar.[4] Membreno Lopez settled her claims against Romero, Saljar, Najjar, Salem, Cole, and Vassar before trial.

The City filed cross-claims against Romero and Saljar, alleging that they violated Chapter 752 of the Texas Health and Safety Code and must therefore indemnify the City for all losses incurred as a result of Membreno's contact with the power line. *See* Tex. Health & Safety Code § 752.008 (providing that person, firm, corporation, or association that commits violation under Chapter 752 "is liable to the owner or operator of the line for all damages to the facilities and for all liability that the owner or operator incurs as a result of the contact").

---

[4] Among her allegations, Membreno Lopez asserted that these defendants knew about the dangerous condition created by the metal scaffolding's proximity to the power lines and that they created an unreasonable risk of harm by allowing the extension of the western overhang on the building to within 5 feet, 6 inches of the power lines and by not contacting the City to de-energize the power lines.

5

Before trial, in its May 2019 reply in support of its summary-judgment motion, the City put Membreno Lopez on notice of its contention that her claim sounds in premises liability, not in general negligence or negligence per se. In response to Membreno Lopez's contention that utility providers owe common-law duties to the public, including Membreno, the City argued that Texas law is clear "that where the plaintiff's injury is allegedly caused by a *dangerous premises condition* created by a premises owner or occupier's negligence, as alleged here, rather than by *contemporaneous* negligent conduct[,] the plaintiff's claim sounds in premises liability and the premises owner therefore owed, at most, a premises-liability duty and not a general-negligence duty." The trial court denied the City's summary-judgment motion, and the case was tried to a jury in June 2019.

At trial, Membreno Lopez put on evidence to support the theory of liability outlined in her petition, arguing that the City was negligent in operating and maintaining its public-utility line because it had failed to inspect its lines and poles to "make sure [they] are not leaning" or "getting too close to buildings." Membreno Lopez's expert witness testified that the cause of Membreno's death was the "defective" power line and pole. The expert opined, based on contemporaneous photographs, that the pole was leaning five to ten degrees from vertical. He further opined that if the pole had been straightened, it would have been between three-and-a-half feet to six feet farther from the building.

Both at the close of Membreno Lopez's evidence and again after the parties rested, the City moved for directed verdict, contending that Membreno Lopez's theory alleging that the City's failure to maintain its lines and poles created the dangerous condition that caused the accident is a premises-liability claim, not a general-negligence claim, and that judgment should be rendered in its favor because Membreno Lopez had not alleged or adduced any evidence that the

6

City's contemporaneous conduct caused Membreno's death, as required to recover on a general-negligence claim. The trial court denied the City's motion.

The City later objected to the submission of a general-negligence question on the ground that the question submitted an invalid theory of recovery, but the trial court overruled the objection and submitted the question to the jury.[5] The jury found the City negligent and assigned it with 26% responsibility for the accident.[6] The jury also found Romero, Saljar, and Membreno negligent, assigning them 34%, 30%, and 10% responsibility, respectively.[7] The jury further found that Saljar and Romero "exercise[d] some degree of control of the work site within six feet of the high voltage overhead line" that Membreno contacted with the metal mesh. In addition, the jury found that Membreno Lopez's child is the biological son of Membreno and awarded a total of $9,360,000 in damages. The trial court signed a final judgment: (1) awarding Membreno Lopez $2,433,600 in damages against the City plus costs, prejudgment interest, and postjudgment interest, and (2) ordering that Saljar and Romero indemnify the City for the same amount as required by Section 752.008 of the Texas Health and Safety Code. This appeal followed.

## ANALYSIS

The City challenges the verdict in three issues related to Membreno Lopez's negligence claim and one issue related to the jury's finding that Membreno Lopez's child is

---

[5] A negligence per se question was not submitted to the jury.

[6] The jury found that the harm to Membreno did not result from gross negligence on the part of the City.

[7] Romero was included in the court's jury charge as a settling defendant pursuant to Chapter 33 of the Texas Civil Practice and Remedies Code. Before submission to the jury, the trial court granted Najjar and Salem's motion for directed verdict as to the City's cross-claim, and it denied all other motions for directed verdict.

7

Membreno's legal heir.  In four issues in its cross-appeal, Saljar asserts that the charge question on indemnification was fatally defective and that the evidence is insufficient to support the judgment under either the legal standard that it contends should have been submitted or the legal standard that was submitted.  We turn first to the City's appeal.

**The City's Appeal**

In its first issue, the City challenges Membreno Lopez's submission of a general-negligence claim to the jury instead of a premises-liability claim.  Its other three issues challenge the sufficiency of the evidence of the elements of duty and proximate cause, which support the jury's finding of negligence, and the sufficiency of the evidence supporting the finding that Membreno Lopez's child is Membreno's legal heir.

**I.      General negligence versus premises liability**

On appeal, the City argues that we should reverse and render judgment in its favor because Membreno Lopez failed to properly submit her premises-liability claim to the jury.  The City asserts that Membreno Lopez's "pleadings, evidence, and her attorney's argument at trial conclusively demonstrate that the true nature of her claim is one for an alleged premises defect on the City's utility easement."  The City contends that because Membreno Lopez's claim sounds in premises liability, which has a heightened standard of proof compared with a general-negligence claim, the trial court erred by submitting a general-negligence question.  Membreno Lopez, on the other hand, asserts that her claim sounds in negligence because "[b]y definition, a claim for premises liability can only be asserted against a person or entity that owns or controls the property at issue," and that both Membreno and the power line that electrocuted him were outside any property owned or controlled by the City when Membreno made contact with the line with the

8

metal mesh that he was holding. The City responds that when a plaintiff's injury arises from a dangerous premises condition—here, the power line that was allegedly "defective" because it was too close to the building—the determinative question is not whether the dangerous condition was technically within the metes and bounds of the defendant's real-property interest. The City argues that instead the determinative question is whether the defendant assumed sufficient control over the dangerous condition that the defendant had the responsibility to fix it.

## A.     Standard of review

A trial court must submit jury questions, instructions, and definitions that "are raised by the written pleadings and the evidence." Tex. R. Civ. P. 278; *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017). When we review alleged error in a jury submission, we consider "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *United Scaffolding*, 537 S.W.3d at 469 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009)). Courts deem alleged charge error "reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment." *Id.* (quoting *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986)); *see also* Tex. R. App. P. 44.1(a)(1).

We review de novo the legal question of whether the condition that allegedly caused the plaintiff's injury is a premises defect. *E.g.*, *United Scaffolding*, 537 S.W.3d at 469. When "a premises-defect case is improperly submitted to the jury under only a general-negligence question, without the elements of premises liability as instructions or definitions," that charge error "causes

9

the rendition of an improper judgment." *Id.* (citing *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997)). "Because premises defect cases and negligent activity cases are based on independent theories of recovery, a simple negligence question, unaccompanied by the *Corbin* elements as instructions or definitions, cannot support a recovery in a premises defect case." *Olivo*, 952 S.W.2d at 529; *see also Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex. 1983).[8]

To the extent the City challenges the legal sufficiency of the jury's fact findings that support Membreno Lopez's submission of the case to the jury under a general-negligence question, the test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit evidence favoring the finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 333–34 (Tex. 2020). We "must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *City of Keller*, 168 S.W.3d at 822.

---

[8] In *Corbin v. Safeway Stores, Inc.*, the Texas Supreme Court held that the plaintiff, who was an invitee, had the burden to prove: (1) that the defendant premises occupier had actual or constructive knowledge of some condition on the premises; (2) that the condition posed an unreasonable risk of harm to the plaintiff; (3) that the defendant did not exercise reasonable care to reduce or to eliminate the risk; and (4) that the defendant's failure to use such care proximately caused plaintiff's personal injuries. 648 S.W.2d 292, 296 (Tex. 1983).

**B.      Control of premises versus control of dangerous condition**

We first consider the legal issue raised by the City—the assertion that even if we assume that it did not own or control the part of the premises where Membreno was working, the determinative question is whether the City had sufficient control over the part of the premises that presented the danger so that it had the responsibility to fix it. *See County of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002). The City asserts that a plaintiff "injured on another's property may have *either* a negligence claim *or* a premises-liability claim," *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016) (emphasis added) (citing *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992)), and that which type of claim a plaintiff has depends on whether it advances "a malfeasance theory based on affirmative, contemporaneous conduct" (i.e., general negligence or negligent activity) or a nonfeasance theory based on the defendant's alleged failure to "adequately warn of the dangerous condition or make the condition reasonably safe" (i.e., premises liability or premises defect), *United Scaffolding*, 537 S.W.3d at 471 (quoting *TXI Operations L.P. v. Perry*, 278 S.W.3d 763, 765 (Tex. 2009)). The Texas Supreme Court has "repeatedly described a landowner's duty as a duty to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not." *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 203 (Tex. 2015). The City contends that Membreno Lopez seeks to avoid the application of the "more stringent" premises-liability principles in this case because the City would have no duty to warn about or correct the placement of its poles or electrical lines, asserting that undisputed evidence showed that Membreno and the rest of the stucco crew saw the power line and were aware of its proximity to the metal scaffolding.

11

In response, Membreno Lopez contends that this case sounds in negligence rather than premises liability because the City never owned or controlled the premises where the power line was located at the time of the accident, and "by definition" a premises-liability case involves an injury on the defendant's premises. Accordingly, Membreno Lopez asserts, the distinction drawn in premises-liability cases between a plaintiff's possible claims of negligent activity or premises defect should only apply in a situation in which the defendant owns or controls the property on which the dangerous condition exists when the plaintiff is injured.

**1. Legal framework—negligence and premises liability**

Before we address the issue of control of the premises versus control of the condition, we provide a brief explanation of how premises liability fits into the framework of the common-law doctrine of negligence. A negligence claim consists of three elements: (1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998). The threshold inquiry in a negligence case is duty; to establish a defendant's liability, "[t]he plaintiff must establish both the existence and violation of a duty owed to the plaintiff." *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

"Premises liability is a special form of negligence where the duty owed to the plaintiff depends upon the status of the plaintiff at the time the incident occurred." *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). Thus, "[d]uty remains a threshold inquiry in a premises-defect claim." *Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 910 (Tex. App.—Houston [14th Dist.] 2009, no pet.). In a premises-liability suit, "the traditional test of the conduct of a reasonably prudent person is simply tailored to a specific category of defendants—

12

owners or occupiers of premises," *Zook v. Brookshire Grocery Co.*, 302 S.W.3d 452, 454 (Tex. App.—Dallas 2009, no pet.), while the elements that define the scope of a property owner or occupier's duty to a plaintiff on the property vary, depending on the plaintiff's status as an invitee, licensee, or trespasser, *Mayer*, 278 S.W.3d at 910.[9]

The defendant's duty "generally runs with the ownership or control of the property." *Occidental Chem. Corp.*, 478 S.W.3d at 644 (citing Restatement (Second) of Torts §§ 351-54 (Am. Law Inst. 1965)). "Ordinarily a person who does not own the real property must assume control over and responsibility for the premises before there will be liability for a dangerous condition existing on the real property. It is possession and control which generally must be shown as a prerequisite to liability." *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986) (citing 62 Am. Jur. 2d *Premises Liability* §§ 12, 14 (1972)).

---

[9] The duty owed in a premises-defect case diminishes, depending on whether the claimant is an invitee or a mere licensee or trespasser. *See Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 909-10 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The duties differ in the following ways:

> An owner or occupier of land must use reasonable care to protect an invitee from known conditions that create an unreasonable risk of harm and conditions that should be discovered by the exercise of reasonable care. An owner or occupier of land must refrain from injuring a licensee willfully, wantonly, or through gross negligence; the owner or occupier who has actual knowledge of a dangerous condition unknown to the licensee must warn of or make safe the dangerous condition. The only duty a premises owner or occupier owes to a trespasser is the duty not to cause injury willfully, wantonly, or through gross negligence.

*Id.* at 910 (citations omitted).

13

## 2. Analysis—control of premises versus control of condition

The City attempts to satisfy this core requirement for determining whether a claim is a premises-liability claim by contending that because it controlled the power line, it "assumed sufficient control over the part of the premises that presented the alleged danger so that the defendant had the responsibility to remedy it," as stated in *County of Cameron*, 80 S.W.3d at 556. The City relies on a number of Texas Supreme Court cases in which the court has held that "a defendant's liability under a premises liability theory rests on the defendant's assumption of control of the premises and responsibility for dangerous conditions on it." *E.g.*, *United Scaffolding*, 537 S.W.3d at 474. In particular, although the City asserts that the evidence confirms that the power line was in the City's electrical easement when Membreno was injured, the City also emphasizes that a plaintiff's injury need not occur on premises that the defendant owned or legally possessed, as long as the defendant assumes sufficient control over the part of the premises that present the alleged danger.

While it is undisputed that the City controlled the power line and poles that Membreno Lopez alleges created a dangerous condition, its assumption of control over the property where the power line was located at the time of the injury is disputed. The City argues that because it controlled the power line, it controlled the relevant "part of the premises that presented the alleged danger." However, this case differs from the cases on which the City relies to support this proposition. In those cases, the defendant was either an independent contractor who worked on the premises, an entity with contractual responsibility for whatever created the dangerous condition, or a utility with an easement or right-of-way where the injury occurred. The courts in those cases concluded that the defendant retained control of the part of the premises where the condition was, whether by contract, easement, or other legal right of possession, even if the

14

defendant was not on the premises when the injury occurred.[10]  In contrast, here the parties dispute the City's control over the part of the premises where the power line was when Membreno contacted it.  The City asserts that the power line remained in its easement, or alternatively, that legal possession of the premises is irrelevant, while Membreno Lopez asserts that the power line was no longer in the City's easement because one of the poles was leaning east five to ten degrees.

Membreno Lopez alleges that the City never controlled the premises where Membreno was injured but instead negligently allowed the power line to move out of its easement, which was adjacent to those premises.  Membreno Lopez's allegations are akin to cases in which the creator of a dangerous condition remained liable in general negligence for creating the condition after it had relinquished control of the property where the condition existed.  *See*

---

[10] *See, e.g.*, *United Scaffolding*, 537 S.W.3d at 467, 479-80 (holding that trial court erred by submitting general-negligence charge to jury instead of premises-liability charge in suit against general contractor when plaintiff was injured by slipping on defective scaffolding built by defendant general contractor (USI) hired by plaintiff's employer to build and inspect scaffolds at employer's refinery and general contractor maintained right to control scaffolds); *County of Cameron v. Brown*, 80 S.W.3d 549, 556 (Tex. 2002) (holding that plaintiffs adequately alleged possession element of premises-liability claim by alleging that County "maintained the [causeway where car accident occurred] pursuant to a contract with the State" and it was undisputed that County "assumed certain maintenance responsibilities over the causeway's streetlight system"); *Newman v. CenterPoint Energy Hous. Elec.*, No. 14-16-00007-CV, 2017 WL 2292577, at *5 (Tex. App.—Houston [14th Dist.] May 25, 2017, no pet.) (mem. op.) (holding that telephone lineman's claim was properly submitted as premises-defect case when he was injured by contact with power company's line that was allegedly sagging below NESC vertical-clearance height when working on shared pole; "here, CenterPoint had control of its poles and power lines located in the 'road right-of-way' subject to a franchise with the City" and "Newman's theory of liability was based on CenterPoint's control over its utility poles and primary power line located in the right-of-way and CenterPoint's failure to remedy or warn about the dangerous condition of its line attached to Pole # 2 that allegedly sagged too close to the top of Pole # 4"); *Oncor Elec. Delivery Co. v. Murillo*, 449 S.W.3d 583, 590-95 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (en banc op.) (holding that trial court erred by submitting general-negligence charge to jury instead of premises-liability charge when demolition-company employee had been injured disconnecting cable from within energized electrical transformer that belonged to utility and transformer was on utility's easement).

15

*Occidental*, 478 S.W.3d at 642 ("When the property's dangerous condition is caused or created by another, an independent claim against the other may lie in negligence."); *see also City of Denton*, 701 S.W.2d at 834 (holding that City was not liable for building's dangerous condition because it had not assumed control over building, and explaining that "the element of control" distinguished case from independent-contractor cases where independent contractor is put in control of premises by owner). Control over the dangerous condition, absent control of the property where the dangerous condition exists, will not suffice to establish that a claim sounds in premises liability rather than general negligence. *See Arredondo v. Techserv Consulting & Training, Ltd.*, 567 S.W.3d 383, 393 (Tex. App.—San Antonio 2018) (concluding that plaintiff's claim sounded in general negligence, not premises liability, because record showed that contractor who removed utility pole for utility on utility-controlled property and allegedly failed to fill hole that plaintiff stepped in did not continue "to exercise control or maintain a right of control over the property after its employees completed the work order and left the job site, or that it possessed or owned the property at the time of [the plaintiff's] injury"), *rev'd in part on other grounds sub nom. AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289 (Tex. 2020); *cf. Texas Cities Gas Co. v. Dickens*, 168 S.W.2d 208, 210 (Tex. 1943) (affirming that question of gas company's general negligence had been properly submitted to jury in case in which plaintiff firefighter was injured when gas company failed to shut off gas from building after explosion started fire because plaintiff was not injured in part of building or premises where gas company had lawful right to place its pipes); *Texas-La. Power Co. v. Webster*, 91 S.W.2d 302, 307 (Tex. 1936) (affirming jury's finding that power company was negligent and holding power company's easement or statutory right-of-way did not allow it to maintain its power line in low, sagging condition less than two feet from ground after poles were struck by lightning, and thus plaintiffs who were killed when they walked into

16

power line at night were not on premises controlled by power company). Thus, to show that Membreno Lopez's claim sounds in premises liability rather than general negligence, the City needed to show that it exercised or maintained control over or rightful possession of the property that the dangerous condition was on at the time of Membreno Lopez's injury—in other words, that the power line remained in its easement.

### C. Sufficiency of the evidence supporting finding that the power line was not on property controlled by the City

Having determined that a nonowner defendant's control of the dangerous condition does not subject the defendant to possible liability for a premises defect unless the defendant is also entitled to control the area of the owner's property where the dangerous condition exists, we must next consider whether the power line was in the City's electrical easement, and thus in an area subject to its control, when Membreno came into contact with it. Although Membreno Lopez argues that the City should have sought jury findings on whether at the time of the accident the power line or Membreno was on City property or the City controlled the premises where the power line was located, the City did not have the burden of proof on this issue—it raised no affirmative defense that implicated this fact. *See* Tex. R. Civ. P. 279 ("Upon appeal, all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived."). Instead, to the extent Membreno Lopez relies on the power line being out of the easement to support her argument that she properly submitted a general-negligence question to the jury, the burden of proof was on her to establish that fact, and we must consider whether legally sufficient evidence supports a finding that the power line was out of the City's easement when Membreno came into contact with it.

17

Membreno Lopez points to evidence including testimony, documentary evidence, and photographs that support a finding that the power line was out of the easement. The jury heard testimony and received evidence about the location of the scaffolding relative to the power line, as well as the width and location of the easement. The admitted documentary evidence includes a site plan and architectural drawing of the proposed work that Saljar submitted as part of its permit request, the City's original easement and various easement maps, Austin Energy employee Joe McNair's sketch of the area (including measurements) made on the day of the accident, the Austin Police Department (APD) report, the OSHA report, and the Austin Fire Department (AFD) report.[11]

---

[11] The APD report, the AFD report, and the OSHA report were all admitted into evidence but only tangentially referred to in testimony. However, they each contain their own descriptions of the scene, as well as various measurements. For example, the APD report contains these measurements:

- "The wires appeared to be within approximately 12 inches of the scaffolding and were later measured at 8 inches from the scaffolding although the distance from the scaffolding at the point of contact was approximately 24 inches."
- "There are three lines running north to south which parallel the west side of the building. The nearest one measured approximately 3.5 to 4 feet (depending on the blowing wind) from the edge of the scaffolding located on the northwest corner. There was another part of the scaffolding on the west side of the building which measured only 8 inches from the lines."
- "I measured a distance of 4 feet from the burn mark on the metal scaffolding to the power line."

The OSHA report contains this information: "Measurements: Scaffold height: 6'6" on one tower; distance from building 16'; distance from live wire approximately 6'"; "no scaffold or conductive object . . . shall be permitted within ten feet of the power line"; "distance from the top tier of scaffold to live wire: 6 feet. Employees using 10 foot lathing wire." The AFD report notes that the "scaffolding was inches away from the high voltage power line."

18

The jury heard testimony from various witnesses about the site plan that Saljar submitted with its permit request. The site plan shows the layout of the entire shopping center and states that its "submittal date" was August 14, 1992. An architectural firm created the site plan, a portion of which is shown below, when the original permits were obtained for the shopping center in 1992. The relevant portion of the site plan is shown below:[12]



[12] The entire site plan was admitted into evidence. This relevant portion, which has been blown up for readability, was extracted from the City's brief. The City's 7-½-foot-wide public-utility easement (PUE) has been highlighted by the Court.

19

It is undisputed that the accident took place on the scaffolding at the northwest corner of the building and that Membreno was working on the west side of the building when it happened. Romero testified that the crew had started by erecting the scaffolding on the short side of the building (by the overhang) and then wrapping it around to cover the north side of the building, where the entrance to the nightclub is and the new smoking deck was being built. In other words, the scaffolding wrapped around the northwest corner, extending south part way down the west side of the building. On the west side of the building, the overhang on which the stucco crew was working is attached from the roof line and extends part way down the side of the building both vertically and horizontally. The stucco crew erected its scaffolding next to the west-side overhang.

The site plan shows that there is a 7-½-foot-wide public-utility easement (PUE) that runs north to south down the west side of the property.[13] Just south of the front of the building, the site plan shows the PUE turning west away from the building at a 90-degree angle before turning south again at a 90-degree angle (referred to by the witnesses as a "dogleg"). Joan Wilhite, Austin Energy's Distribution Construction Supervisor, who supervises both field operations and review operations, went out to the site on the day of the accident to assess what happened because there was an active building permit for the address, and approving permit applications is part of what her group does. Wilhite testified that the City has control of the 7-½-foot-wide PUE. The City admitted into evidence the easement filed in the Travis County real property records, which also states that the easement is 7-½-feet wide and that it runs from the southwest corner of the lot bearing "N.60°18'W., 28.75 feet; THENCE N.29°51'E., a distance of 150 feet to point of

---

[13] Another Austin Energy employee, Jerome Mendez, testified that a PUE is "an easement where you can have different utilities in that easement. . . . water, wastewater, electric, gas."

20

termination." During her testimony, Wilhite measured for the jury on the site plan that the distance from the northwest corner of the building to the closest edge of the PUE was 10 feet. Neither the site plan nor Saljar's architect's drawing submitted with the permit application shows the 3-foot-wide overhang on the west side of the building.[14]

Joe McNair, an Austin Energy employee, took measurements and made this sketch of the area on the day of the accident, which was introduced into evidence:[15]



_____

[14] Membreno Lopez did not present any evidence showing that the overhang existed in 1992 when the site plan was created. She introduced a Google Earth photograph from March 2003 that shows the overhang from above, but she did not introduce any evidence of when it was built.

[15] This relevant portion of the sketch admitted into evidence was included in both the City's and Membreno Lopez's briefs.

McNair testified to the following undisputed measurements, as shown on his sketch:

- the overhang on which the stucco crew was working extended 3 feet from the west wall of the building;

- the scaffolding on the west side of the building was 5-feet, 1-inch wide; and

- the distance from the scaffolding's east legs to the building's west wall underneath the west-side overhang was 3 feet, 1 inch, meaning there was 1 inch between the east side of the scaffolding and the west-side overhang.

Adding those numbers together, the western edge of the scaffolding was 8 feet, 2 inches from the building's west wall and 5 feet, 2 inches from the west-side overhang.

McNair testified that the power line on the western side of the property did not run perfectly parallel to the building and instead ran diagonally. The southwest end of the scaffolding was only 3 inches from the line, as reflected in McNair's sketch, which shows the measurement as: "south 3" from primary to scaffold" (a circle is drawn around 3" on the sketch). But McNair testified that because the line did not run perfectly parallel to the building, the horizontal distance from the line to the northwest corner of the scaffolding where Membreno was working at the time of the injury was farther away—roughly 2 feet. This 2-foot distance is also visible in multiple photographs of the construction site that were admitted into evidence and is further supported by Romero's testimony that the stucco crew noticed that the power lines were "maybe two feet away . . . from the scaffold" when they were erecting the scaffolding. However, McNair acknowledged that his sketch did not account for the fact that where the scaffolding wrapped around the corner of the building, and the west-side scaffolding connected with the scaffolding on the front side, the scaffolding appears in a photograph to become somewhat narrower than the rest of the west-side scaffolding.

22

While McNair's testimony potentially places the power line 2 inches inside the PUE, Austin Energy construction design coordinator Jerome Mendez's testimony indicated that he was not sure where the power line was and that the 90-degree dogleg shown on the PUE made it difficult to tell whether the line was in the easement. In addition, none of the City's witnesses was able to explain why the easement would dogleg like that or confirm whether the power line could have remained in the easement as it crossed that part of the property since the power line did not dogleg at two 90-degree angles.

Viewing the evidence in the light most favorable to the verdict and considering the number of different and imprecise measurements in the record and the lack of clarity about the dogleg in the easement shown on the site plan, we conclude that reasonable and fair-minded jurors could have found that the power line was not in the easement where Membreno contacted it and was injured. *See City of Keller*, 168 S.W.3d at 827. Thus, the jury could have reasonably found that the City was not in control of the premises where the dangerous condition was located when Membreno was injured, which means that Membreno Lopez's claim sounds in general negligence. Accordingly, we overrule the City's first issue.

## II.     Legal sufficiency of the evidence supporting the jury's finding that the City was negligent

The City challenges the legal sufficiency of the evidence supporting the jury's negligence finding against it in its second and third issues. First, it contends that uncontroverted evidence established that the City complied with its duty under Texas law regarding clearance standards applicable to the power line. Second, it argues that the evidence is legally insufficient to support the jury's finding that the City proximately caused Membreno's injuries because Membreno Lopez's expert and sole witness on causation conceded that he did not rule out

23

alternative causes and did not otherwise provide any evidence that the City's acts or omissions were the cause in fact of Membreno's injuries.

**A.  Legal sufficiency of the evidence supporting the jury's finding of a legal duty to Membreno and its breach by the City**

The City asserts that Membreno Lopez's negligence claim was predicated on an alleged breach of a duty to maintain minimum NESC horizontal-clearance standards, creating a dangerous condition that resulted in Membreno's injuries, but that Membreno Lopez was wrong as a matter of law about which NESC clearance standard applies to the power line at issue here. It further argues that the evidence conclusively establishes that the City was in compliance with the applicable standard, conclusively negating the breach element of Membreno Lopez's claim. Membreno Lopez responds that not only does the City's challenge to the NESC clearance standard fail on the merits, it also fails because she alleged and presented evidence of breaches of various other duties that she alleges the City owed to Membreno, including inspecting the lines and utility pole, ensuring that the lines did not pose a hazard to workers near the building, and using "good utility practice," and thus the judgment is supported by legally sufficient evidence of those breaches of other duties. The City responds that the other duties alleged by Membreno Lopez are all functions "of *how* the City could have complied with its alleged duty to maintain its power line within the NESC's horizontal clearance requirement" and that because the evidence conclusively established the City's compliance with the applicable NESC clearance standard, the City conclusively negated the breach element of Membreno Lopez's negligence claim.

The existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Expert testimony is required to establish the standard of care that a utility owes and any

24

breach of that duty. *Cura-Cruz v. CenterPoint Energy Hous. Elec., LLC*, 522 S.W.3d 565, 570 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *Schwartz v. City of San Antonio ex rel. City Pub. Serv. Bd. of San Antonio*, No. 04-05-00132-CV, 2006 WL 285989, at *4 (Tex. App.—San Antonio Feb. 8, 2006, pet. denied) (mem. op.) (holding that plaintiff suing utility for negligence was obligated to present expert testimony discussing appropriate standard of care and whether utility's conduct met that standard)). Generally, a public utility has a duty to exercise ordinary and reasonable care, but the degree of care required must be commensurate with the danger. *First Assembly of God, Inc. v. Texas Utils. Elec. Co.*, 52 S.W.3d 482, 491-92 (Tex. App.— Dallas 2001, no pet.) (citing *Dickens*, 168 S.W.2d at 210 (holding that gas company failed to exercise ordinary care to cut off gas when requested to do so after explosion had started fire in building, resulting in second explosion that injured plaintiff); *West Tex. Utils. v. Renner*, 53 S.W.2d 451, 453-54 (Tex. Comm'n App. 1932, holding approved) (holding that utility company's duty was to use ordinary care to have its premises in reasonably safe condition and that evidence supported jury's finding that utility company negligently maintained high-voltage wires in uninsulated condition dangerously near place where employee of independent contractor was doing construction work on utility's building)). This "commensurate with the danger" standard does not impose a higher duty of care; rather, it more fully defines what is ordinary care under the facts presented. *Renner,* 53 S.W.2d at 453-54; *see also First Assembly of God*, 52 S.W.3d at 491-92 (holding utility company had duty to exercise ordinary care when it replaced transformers and other equipment outside church and restored electricity to church).

While Forest Smith, Membreno Lopez's expert, opined at trial that the City failed to keep its lines and poles compliant with NESC requirements, he also opined that the City failed to operate according to "good utility practice," "particularly with regard to the pole lean and lack

of an inspection program." Smith explained that "good utility practice" is a term that was adopted by the Texas Public Utility Commission and that "good utility practice is not necessarily optimum practice. It's not necessarily the most economical practice, but it is a practice that is widely recognized in the industry and especially the region in which that utility company is operating; in other words, it's what . . . most other utilities are doing." Smith's explanation tracks the Public Utility Commission's rule defining "good utility practice" as:

> Any of the practices, methods, and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any of the practices, methods, and acts that, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety, and expedition. Good utility practice is not intended to be limited to the optimum practice, method, or act, to the exclusion of all others, but rather is intended to include acceptable practices, methods, and acts generally accepted in the region.

*See Cura-Cruz*, 522 S.W.3d at 571 (quoting 16 Tex. Admin. Code § 25.5(56) (Pub. Util. Comm'n, Definitions) and explaining that good utility practice "does not impose a different duty of care; rather, it more fully defines what ordinary care is under the facts presented").

Smith opined that the NESC places the burden on the utility to be code compliant at all times, that the City was not in compliance with NESC standards or the Texas law adopting them, and that these failures were a proximate cause of Membreno's death. He further opined that the City failed to systematically inspect its poles and that one of the poles in question was leaning 5 to 10 degrees, making it defective "[b]ecause it brings the line closer to the building." Smith also opined that if the City had remedied the defect by straightening the pole, the power line would have been 3-½ feet to 6 feet farther away from where Membreno was working, and the accident would never have happened. While the City characterizes Smith's expert testimony about the

26

various duties alleged by Membreno Lopez as merely explaining how the City could have complied with its alleged duty to maintain its power line within the NESC's horizontal-clearance requirement, we disagree with this characterization.

Smith's expert opinion was that the City, under the circumstances present in this case, had a duty to exercise reasonable care, commensurate with the danger to people working near power lines, to inspect its poles regularly and to remedy the lean in the pole at issue here. Based on McNair's evidence that the western edge of the scaffolding was 5 feet, 2 inches from the west-side overhang and that the horizontal distance of the power lines was approximately 2 feet from the western edge of the scaffolding at the north end where Membreno was working, the jury could have reasonably determined that the power line was approximately 7 feet, 2 inches from the overhang, which would have made it NESC compliant under the 1975 standard.[16] Thus, the jury could also have reasonably determined that it was the City's failure to remedy the leaning pole that was the relevant breach of duty, based on Smith's testimony that if the pole had been straightened even 5 degrees and brought back roughly 3-½ feet (which would make the line nearly 11 feet away from the overhang), the accident would never have happened. Accordingly, we overrule the City's second issue.

---

[16] The City contends that the relevant NESC standard only requires its lines to be compliant with the standard at the time the pole was built in 1975, which would mean that the line is compliant as long as it is at least 3 feet from the building. Membreno Lopez, on the other hand, asserts that the line is required to comply with today's standard of a 7-½-foot horizontal clearance. We need not resolve the dispute over the applicable standard because we conclude that the jury could have reasonably determined that the City had a duty that it breached to remedy the leaning pole regardless of whether the jury thought the line was compliant with the NESC horizontal-clearance standard.

**B.** **Legal sufficiency of the evidence supporting the jury's finding of proximate cause**

In its third issue, the City contends that the evidence of proximate cause is legally insufficient because the only causation evidence that Membreno Lopez provided was Smith's expert testimony, which "was speculative and conclusory and thus amounted to no more than a mere scintilla of evidence." The City contends that the evidence established "at most, that the City furnished a condition that made Membreno's injury possible," which is insufficient to establish the cause-in-fact element of proximate cause. *See, e.g.*, *IHS Cedars Treatment Center of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex. 2004). In response, Membreno Lopez contends that Smith's expert testimony established that the City's breaches of its alleged duties proximately caused Membreno's death and that others were also partially responsible. Membreno Lopez summarizes the following testimony by Smith as providing more than a scintilla of evidence supporting proximate cause: (1) his testimony that the accident would not have happened if the City had straightened its poles even slightly, (2) his explanation that it could not be assumed that Membreno was holding the 10-foot metal mesh piece at the very end to extend it the full 10 feet, and (3) his disagreement with the City's suggestion that it would not have made a difference if there had been proper inspections or if the clearance was proper. To rebut this argument, the City asserts that Smith focused on the condition created by the City's alleged negligence in failing to inspect and remedy the leaning pole without giving "consideration to *what actually happened* on the day of the accident, as a causation expert must." The City also focuses on Smith's failure to explain alternative theories of causation, including the possibility that Membreno would still have contacted the line with the 10-foot metal mesh even if the City had remedied the lean in the pole,

pulling the line farther away, arguing that his failure to consider this possibility and the acts of the other defendants renders his opinion speculative and legally insufficient.

The two components of the proximate-cause element of a negligence claim are cause in fact (or substantial factor) and foreseeability. *IHS Cedars*, 143 S.W.3d at 798. These elements cannot be established by mere conjecture, guess, or speculation. *Id.* at 798-99. Cause in fact is established when the negligent act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred. *Doe v. Boys Club of Greater Dall., Inc.,* 907 S.W.2d 472, 477 (Tex. 1995). "Cause in fact is not shown if the defendant's negligence did no more than furnish a condition which made the injury possible." *Id.* The evidence must show that the negligence was the proximate, as opposed to a remote, cause of the resulting injuries, and must "justify the conclusion that such injury was the natural and probable result" of the negligent act or omission. *Id.* However, even if the injury would not have happened but for the defendant's conduct, the connection between the negligent act and the injury may be too attenuated to constitute legal cause. *Id.*; *see also IHS Cedars*, 143 S.W.3d at 803 (holding that mental-health-care facility and its employees' alleged negligence in discharging plaintiff at same time as her roommate was not cause in fact of plaintiff's involvement in single-car accident in car driven by roommate who experienced psychotic episode while driving).

Here, while the evidence supports that there are multiple proximate causes of Membreno's injury, we disagree with the City's argument that Smith, a forensic electrical engineer, was required to opine on the role that the other defendants played in the accident or to assess their comparative fault. When establishing the defendant's conduct as a cause in fact or substantial factor in bringing about the injury, "the plaintiff need not exclude all possibility that the accident occurred other than how he alleges, but instead must only prove the greater probability

29

is that the defendant's conduct was a cause of the accident." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex. 1987), *superseded by statute on other grounds as stated in F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 684 (Tex. 2007) (explaining that Dram Shop Act narrowed potential liability of dram shops for negligence). In other words, in this case, the question before the jury was whether it was a greater probability that the City's alleged negligence in not remedying the pole's lean was a cause of Membreno's injury than that it was not. Smith testified that he had used a technique called "photogrammetry" to measure the angle of the pole's lean from photographs and that by straightening the pole 5 to 10 degrees, the line would have moved 3-½ feet to 6 feet farther away from where Membreno was working. Smith explained that in the photograph shown to the jury, the two transformers attached to the top of the pole were heavy enough that "[i]t takes two good men typically to get one up" to the top of the pole, and the pole was leaning in the direction of the larger of the two transformers. Smith further testified that he would have expected the City to be out at the site over the course of the 34 years that the pole had been installed, "that the odds are better than 50 percent that they would have been on the site for some reason," and that if they had been on the site, it would have been prudent for them to have noted the pole's condition. As explained above in connection with the duty analysis, based on McNair's evidence that the western edge of the scaffolding at the north end where Membreno was working was approximately 2 feet from the power lines, the jury could have reasonably determined that the power line was approximately 7 feet, 2 inches from the overhang. Smith also testified that it could not be assumed that Membreno would have contacted the line with the 10-foot mesh even if the line was further away because Smith does not know (and the evidence does not show) where Membreno was gripping the mesh. His ultimate conclusion was that if the City had straightened the poles by 5 to 10 degrees, the power line would have been 3-½ feet to 6 feet farther

30

away (i.e., a total of almost 11 feet to 13 feet away) and the accident would never have happened.[17]

Viewing the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support it, we conclude that Membreno Lopez's expert established that the City's failure to remedy the leaning pole was a proximate cause of Membreno's injury. *See, e.g.*, *City of Keller*, 168 S.W.3d at 822, 827 ("The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."). We overrule the City's third issue.

### III. Legal sufficiency of the evidence establishing that Membreno Lopez's child is Membreno's legal heir

In its fourth issue, the City challenges the sufficiency of the evidence supporting the trial court's award of survival damages, asserting that Membreno Lopez failed to prove her capacity to bring a survival claim because she did not establish that her minor child is Membreno's legal heir for purposes of a survival claim in the manner required by Texas law. Membreno Lopez responds that the City has waived its claim that she lacks capacity by failing to file a verified denial and by not objecting at the charge conference to the questions concerning heirship and damages. Moreover, Membreno Lopez asserts that because she sued on behalf of her minor child four years after Membreno died intestate, no administration of his estate was necessary, and as Membreno's only son, the child is his heir and the estate passes to him. In addition, Membreno urges that the

---

[17] The City asserts that Smith's conclusion is a "bare opinion" because he initially stated that if the City had remedied the lean, the accident would "probably not" have happened. However, after walking through the process that Smith used to determine the angle of the pole's lean and how far the line would have moved if the pole had been straightened, Membreno Lopez's counsel asked if the pole had been straightened even the five degrees at the low end of his estimate, "would this accident have ever happened?" Smith responded, "In my opinion, no."

child's heirship was an issue weighed and confirmed by the jury when they determined by clear and convincing evidence that he is the biological son of Membreno.

As an initial matter, we address Membreno Lopez's waiver and error-preservation arguments. Membreno Lopez asserts that the City has waived its claim that she lacks capacity because it failed to file a verified denial as required by Texas Rule of Civil Procedure 93. On the same day that the City filed an answer in which it asserted "the affirmative defense of lack of capacity to sue," it also filed a motion to appoint an attorney/guardian ad litem, alleging that Membreno Lopez lacked capacity to sue. The motion was supported by an affidavit, sworn to before a notary, in which the City's counsel declared under penalty of perjury her personal knowledge of the facts stated in the affidavit and that the facts are true and correct. We conclude that the City did not waive its claim that Membreno Lopez lacks capacity to sue. *See Southern Cnty. Mut. Ins. v. Ochoa*, 19 S.W.3d 452, 462 (Tex. App.—Corpus Christi 2000, no pet.) (explaining that when "[a] verification is filed at the same time as the pleading to which it relates, it would be overly technical to deny it any weight simply because it was not physically attached to the proper pleading").

Membreno Lopez also asserts that the City failed to object to the jury questions concerning heirship and damages and that the only portion of the damages question that the City objected to at the charge conference concerned medical bills, not survival damages. However, the City's capacity challenge on appeal is not an assertion of charge error; instead, the City argues that Membreno Lopez's evidence at trial was legally insufficient to support the survival damages claim. The City raised this challenge in its motion for directed verdict and its motion for judgment notwithstanding the verdict, and thus, it properly preserved this issue for appeal. *See Cecil v. Smith*, 804 S.W.2d 509, 510-11 (Tex. 1991).

Turning to the merits of the City's capacity challenge, the Texas survival statute provides that a decedent's personal-injury claim "survives to and in favor of the heirs, legal representatives, and estate of the injured person." Tex. Civ. Prac. & Rem. Code § 71.021. The parties to a survival action seek adjudication of the decedent's own claims for the alleged injuries inflicted upon him by the defendant, and the decedent's survival claim becomes part of his estate at death; thus, the estate has standing to pursue such a claim. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005). In general, only the estate's personal representative has the capacity to bring a survival claim, but under certain circumstances a decedent's heirs may be entitled to sue on behalf of the estate. *Id.* (explaining that, for example, if suit is brought during four-year period to institute administration proceedings, heirs may maintain survival suit if they allege and prove that there is no administration pending and that none is necessary).

Membreno Lopez asserts that because the suit was filed more than four years after Membreno's death, she was not required to allege and prove that no administration of Membreno's estate was pending and that no administration was necessary because the period for opening an administration had passed. *See* Tex. Est. Code § 301.002(1); *see also Shepherd v. Ledford*, 962 S.W.2d 28, 33 (Tex. 1998) (explaining that no administration of estate was necessary when decedent died intestate, plaintiff was decedent's common-law wife and only surviving heir entitled to estate, decedent's family had agreed she was only heir, and debts of estate had been paid). She further asserts that her testimony at trial established that the child is Membreno's heir under Estates Code Section 201.001. The City, on the other hand, argues that Membreno Lopez was required to establish that the child was Membreno's heir through competent proof and that even if she arguably established at trial that the child is Membreno's biological child, establishing parentage at trial is insufficient under Texas law to establish that the child was Membreno's legal heir for purposes of

33

a survival claim. The City asserts that Membreno Lopez instead was required to satisfy one of the conditions set forth in Estates Code Section 201.052 for establishing paternal heirship.

The Texas Estates Code defines an "heir" as "a person who is entitled under the statutes of descent and distribution to a part of the estate of a decedent who dies intestate." Tex. Est. Code § 22.015; *see id.* ch. 201 (Descent and Distribution); *see also Shepherd*, 962 S.W.2d at 31 (analyzing whether plaintiff was "heir" for purposes of survival statute by applying relevant Probate Code definition).[18] Estates Code Section 201.001 establishes that if a person who dies intestate does not leave a spouse, "[t]he person's estate descends and passes to the person's children and the children's descendants." Tex. Est. Code § 201.001(a)-(b). Another statute of descent and distribution, Estates Code Section 201.052, provides in relevant part that:

> For purposes of inheritance, a child is the child of the child's biological father if:
>
> (1) the child is born under circumstances described by Section 160.201, Family Code [or]
>
> (2) the child is adjudicated to be the child of the father by court decree under Chapter 160, Family Code . . . ."

*Id.* § 201.052 (a)(1)-(2); *see also Bell v. Hinkle*, 607 S.W.2d 936, 937 (Tex. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (explaining that child born out of wedlock could not recover in suit related to purported father's estate without first satisfying conditions of former Probate Code Section 42, now Estates Code Section 201.052).

Family Code Section 160.201 provides several ways that the father-child relationship may be established, including "an adjudication of the man's paternity," but it does not

---

[18] In 2013, the Texas Estates Code replaced the Texas Probate Code. *See* Tex. Est. Code § 21.001.

explicitly limit such an adjudication to the procedure set forth under Chapter 160, Subchapter G, Proceeding to Adjudicate Parentage, relevant here, or to the other situations in Chapter 160 in which parentage may be adjudicated. Tex. Fam. Code § 160.201(b)(3). Because Estates Code Section 201.052 refers in the alternative to a child born under circumstances described by Section 160.201 (which includes adjudication of paternity) or to a child whose parentage is adjudicated under Chapter 160 in general, only by reading Family Code Section 160.201 as allowing adjudication of paternity in a proceeding other than a Chapter 160, Subchapter G proceeding can we avoid a reading of Estates Code Section 201.052 that would render Subsection (a)(2) superfluous. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) (explaining that Legislature would not have illustrated four types of specific power if "general control" could be read to include power of annexation and quoting *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 601 (1915), for proposition that "[i]t is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative").

The City asserts that Membreno Lopez lacks capacity because she did not either petition the probate court for a posthumous "determination of right of inheritance from [the] decedent," Tex. Est. Code § 201.052(c), or initiate a proceeding to declare heirship under Estates Code Chapter 202. However, based on our construction of Estates Code Section 201.052(a) and under the circumstances present here where there is no indication of any need for an administration of Membreno's estate under the Estates Code and the child's paternity was adjudicated at trial, we conclude that Membreno Lopez was not required either to petition the probate court for a determination of right of inheritance or to initiate a Family Code Chapter 160, Subchapter G

35

proceeding to adjudicate parentage.[19] *Cf. Garza v. Maverick Mkt., Inc.*, 768 S.W.2d 273, 275 (Tex. 1989) (holding that wrongful-death statute allowing recovery by decedent's children did not incorporate Family Code's paternity-determination provisions, reasoning that Family Code chapter's purpose is to protect rights of mothers and putative fathers and child's best interest, not to address tort actions or protect tortfeasors, and that paternity can be proved at trial of wrongful-death suit). Instead, she sought an adjudication of Membreno's paternity at trial, as permitted under Family Code Section 160.201(b)(3) and incorporated into Estates Code Section 201.052(a)(1) (child is father's child if born under circumstances described by Family Code Section 160.201). The City does not challenge the sufficiency of the evidence supporting the jury's finding that Membreno is the biological father of the child. Therefore, we conclude that legally sufficient evidence supports Membreno Lopez's capacity to bring the survival claim on behalf of the child as Membreno's heir. We overrule the City's fourth issue.

**Saljar's Cross-Appeal**

The City, as owner of the power lines, filed a cross-action against defendants Romero and Saljar seeking indemnification under Chapter 752 of the Texas Health and Safety Code. Chapter 752 provides that a person or entity that violates a provision of the chapter is liable to the owner or operator of the line for all damages to its facilities and all liability incurred, if the violation results in physical or electrical contact with a high-voltage overhead line. *See* Tex. Health & Safety Code § 752.008. In answer to Question No. 8, the jury found that Saljar (and Romero, who has not appealed) had "exercise[d] some degree of control of the work site within

---

[19] We note that Chapter 160, Subchapter G does not appear to contemplate a posthumous proceeding to adjudicate parentage. *See* Tex. Fam. Code § 160.603 (establishing that man whose paternity of child is to be adjudicated is necessary party to proceeding).

six feet of the high voltage overhead line that caused or contributed to the occurrence in question." Based on the jury's answer, the trial court rendered judgment that the City recover from Saljar and Romero the amount of recovery granted in Membreno Lopez's favor against the City, i.e., the entire $2,433,600 verdict, plus court costs and pre- and post-judgment interest. Saljar perfected its appeal after its motions for judgment notwithstanding the verdict and new trial were overruled.

In four issues, Saljar argues that (1) the trial court applied an incorrect legal standard in the jury charge because it should have asked the jury whether Saljar exercised some degree of control over the details of the contractor's work, as opposed to control over the work site within six feet of the power line; (2) the record contains no evidence to support the judgment under the correct legal standard; and (3) the evidence is legally and (4) factually insufficient to support the jury's answer to Question No. 8, even as incorrectly submitted. In response, the City argues that the jury charge properly focused on the intent of the statute while also incorporating the statutory text's 6-foot limitation on the scope of control. The City further contends that while Saljar may not have been involved with the implementation details of applying the stucco to the building, there is sufficient evidence to support finding that it exercised both some degree of control over the work site and control over the key detail of the work that matters for purposes of the indemnification statute—whether the work would take place within 6 feet of a high-voltage power line.

## I.      Statutory framework and standard of review

The Texas Health and Safety Code mandates that a "person, firm, corporation, or association," other than a utility employee, who is "responsible for temporary work or a temporary activity or function" closer than 6 feet "to a high voltage overhead line . . . must notify the [utility]

37

at least 48 hours before the work begins."[20] *See id.* §§ 752.002 (establishing exemption for utility employees), .003(a) (imposing requirement to notify utility before beginning work and arrange for temporary clearance between high-voltage line and work to be done), .004(a) (establishing distance within which work may not occur without first notifying utility and "guard[ing] against danger by contact with the line as prescribed by Section 752.003"). Section 752.003(b) prohibits a person or entity from beginning the temporary work until the person or entity responsible for the work and the utility "have negotiated a satisfactory mutual arrangement to provide temporary de-energization and grounding, temporary relocation or raising of the line, or temporary mechanical barriers to separate and prevent contact between the line and the material or equipment or the person performing the work, activity, or function." *Id.* § 752.003(b). The person or entity "responsible for" the temporary work must pay the utility for the costs associated with "providing the clearance prescribed in the agreement," and the utility may require payment in advance. *Id.* § 752.003(c).

Section 752.004's prohibition against performing temporary work before providing notice to the utility applies to work that is going to be performed within 6 feet of a power line. *Id.* § 752.004(a). Specifically, unless a person or entity "effectively guards against danger by contact with the line" by making prior arrangements with the utility, the person or entity "may not perform" temporary work "if at any time it is possible that the person performing the [work] may . . . move or be placed within" or "bring any part of a tool, equipment, machine, or material within six feet of a high voltage overhead line while performing the [work]." *Id.* In addition,

---

[20] For convenience, we will refer to "[a] person, firm, corporation, or association" as a "person or entity" and "temporary work or a temporary activity or function" as "temporary work." We also refer to the owner or operator of the line as the "utility."

Section 752.005 prohibits a person from erecting or installing structures and operating or handling tools, machines, equipment, supplies, or materials "within six feet of a high voltage overhead line." *Id.* § 752.005. Section 752.004 also specifies that an employer "may not require an employee to perform a function or activity" that would violate the six-foot mandate. *Id.* § 752.004(b).

The Texas Legislature passed Chapter 752 to ensure the safety of individuals engaged in activities near high-voltage power lines. *See, e.g.*, *Jordan v. Centerpoint Energy Hous. Elec.*, No. 14-18-00663-CV, 2019 WL 5565978, at *6 (Tex. App.—Houston [14th Dist.] Oct. 29, 2019, pet. denied); *AEP Tex. N. Co. v. SPA Pipe, Inc.*, No. 03-06-00122-CV, 2008 WL 5210919, at *3 (Tex. App.—Austin Dec. 12, 2008, pet. dism'd) (mem. op.). Accordingly, the Health and Safety Code imposes criminal penalties for violations of Chapter 752. *See* Tex. Health & Safety Code § 752.007. And when a person or entity's failure to comply with Chapter 752 results in physical or electrical contact with a high-voltage overhead line, a person or entity that committed the violation is liable to the utility "for all damages to the facilities and for all liability that the [utility] incurs as a result of the contact." *Id.* § 752.008. "The purpose of the indemnification provision of chapter 752 is to place the liability for losses resulting from noncompliance with the notification and safety provisions on *the 'person . . . responsible' for having workers near the line.*" *Martinez v. Gulf States Util. Co.*, 864 S.W.2d 802, 805 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (emphasis added).

The issues presented by Saljar include a charge issue that involves statutory construction to determine the proper legal standard for who is the "person . . . responsible for the temporary work" under Chapter 752, as well as evidentiary-sufficiency issues. We review alleged jury-charge error for abuse of discretion, "and abuse of discretion occurs only when the trial court acts without reference to any guiding principle." *Texas Dep't of Human Servs. v. E.B.*,

802 S.W.2d 647, 649 (Tex. 1990). "The goal of the charge is to submit to the jury issues for decision logically, simply, clearly, fairly, correctly, and completely. Toward that end, the trial court is afforded broad discretion so long as the charge is legally correct."[21] *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). We review issues of statutory construction de novo. *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). When construing statutes, "our primary objective is to give effect to the Legislature's intent." *Id.*

## II.     Question No. 8's statement of the applicable legal standard

In Saljar's first issue, it contends that Question No. 8 was fatally defective because it incorrectly stated the applicable legal standard for determining whether Saljar was the person or entity "responsible for temporary work" closer than 6 feet to the City's power line. Saljar argues that instead of asking whether Saljar had "exercise[d] some degree of control of the work site

---

[21] In its reply brief, Saljar asserts that it challenges "the content of the charge—e.g., a definition or instruction" as legally incorrect, and thus, we should review the charge de novo. *See, e.g.*, *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2002) ("Whether a definition used in the charge misstated the law is a legal question" that we review de novo.). We disagree. In this case, Saljar does not contend that a definition or instruction used in the charge misstated the law; no definition or instruction was given with Question No. 8. Instead, the record reflects that Saljar objected to Question No. 8 in its entirety, submitting its own proposed question on Chapter 752 with a requested instruction for determining who was a responsible person for temporary work. Appellate courts review a trial court's decision to submit a particular instruction or definition under the abuse-of-discretion standard. *Oadra v. Stegall*, 871 S.W.2d 882, 889 (Tex. App.—Houston [14th Dist.] 1994, no writ). The trial court's latitude in this area is even greater than in the area of jury questions. *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 351 (Tex. App.—Austin 2002, pet. denied). Courts only employ a de novo standard of review when an appellant complains that a definition or instruction actually given to the jury misstates the law. *Oadra*, 871 S.W.2d at 890. Moreover, "[f]ailure to submit [an instruction] shall not be deemed a ground for reversal of the judgment unless a substantially correct [instruction] has been requested in writing and tendered by the party complaining of the judgment." *Union Pac. R.R. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (citing Tex. R. Civ. P. 278). Accordingly, we will consider whether Saljar submitted a substantially correct instruction.

within six feet of the high voltage overhead line that caused or contributed to the occurrence in question," the charge should have asked who exercised control over the details of the contractor's work.[22] Saljar contends that the record is devoid of evidence that Saljar controlled the details of Romero's work and that if the question had been submitted with the correct legal standard, the jury therefore would have been precluded from finding Saljar was a "person responsible for temporary work" under Section 752.003(a). Consequently, it argues that the trial court's submission of that question probably caused the rendition of an improper judgment, and that we should render judgment that the City take nothing, or alternatively, remand the City's cross-action against Saljar for a new trial.

Chapter 752 does not define "person responsible," and Texas courts applying the statute to the specific facts before them have used both of the phrases at issue here. Saljar argues that there is a split in authority among these cases and that we should reject the flawed analysis in the older cases deciding that a party who exercises "some degree of control over the work site" is a "person responsible" for the work under Section 752.003. We disagree that the use of different phrasing in these cases necessarily indicates a split in authority; instead, there is a central theme that runs through them. Courts that have considered the issue, including in the cases relied on by Saljar, have determined that the key concern in identifying the "person responsible" is

_____

[22] When it objected to Question No. 8 in its entirety, Saljar submitted its own proposed question on Chapter 752: "Were any of the following below a person responsible for temporary work or a temporary activity or function near the high voltage overhead line in question?" Saljar's proposed question included the following instruction: "To be a responsible person, one must have actually exercised control over the details of the contractor's work." As support for this proposed instruction, Saljar cited *Espinoza v. Hicks*, 984 S.W. 2d 274, 277 (Tex. App.—El Paso 1998, no pet.), and *Wood v. Phonoscope, Ltd.*, No. 01-00-01054-CV, 2004 WL 1172900 at *9-10 (Tex. App.—Houston [1st Dist.] May 27, 2004, no pet.) (mem. op.), *op. supplemented on denial of reh'g*, No. 01-00-01054-CV, 2004 WL 2476570 (Tex. App.—Houston [1st Dist.] Nov. 4, 2004, no pet.) (supp. op. on reh'g).

identifying the person or entity responsible "for having workers near a power line." *See Jordan*, 2019 WL 5565978, at \*6 (quoting *Martinez*, 864 S.W.2d at 805); *AEP*, 2008 WL 5210919, at \*3 (quoting *Chavez v. City of San Antonio ex rel. City Pub. Serv. Bd. of San Antonio*, 21 S.W.3d 435, 439 (Tex. App.—San Antonio 2000, pet. denied)); *Chavez*, 21 S.W.3d at 439 (quoting *Martinez*, 864 S.W.2d at 805); *McCaughtry v. Barwood Homes Ass'n*, 981 S.W.2d 325, 334 (Tex. App.— Houston [14th Dist.] 1998, pet. denied) (citing *Martinez*, 864 S.W.2d at 805); *Martinez*, 864 S.W.2d at 805; *cf. Wood v. Phonoscope, Ltd.*, No. 01-00-01054-CV, 2004 WL 1172900, at \*10 (Tex. App.—Houston [1st Dist.] May 27, 2004) (mem. op.), *op. supp. on denial of reh'g*, No. 01-00-01054-CV, 2004 WL 2476570 (Tex. App.—Houston [1st Dist.] Nov. 4, 2004, no pet.) (supp. op. on reh'g) ("[S]ections 752.003(a) and (b) impose a duty on the party who is responsible for the work and *most knowledgeable about the need to notify* the utility." (Emphasis added.)); *Trail v. Friedrich*, 77 S.W.3d 508, 513 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *Espinoza v. Hicks*, 984 S.W.2d 274, 277 (Tex. App.—El Paso 1997, no pet.)); *Espinoza*, 984 S.W.2d at 277) (identifying "person responsible" as "presumably most knowledgeable about the need to notify the utility"); *see also Hullum v. Skyhook Corp.*, 753 F.2d 1334, 1337 (5th Cir. 1985) (applying Texas law and concluding that focus should be on parties who are "ones most likely to know whether or not the work will be performed near power line," not "parties who do not determine the location of the work site or its proximity to power line").

Saljar asserts that the better-reasoned cases inquire "into whether the landowner either directed or retained a right to direct *the details of the contractor's work*" when determining who is the party responsible for temporary work under Section 752.003(a) and that we should limit Chapter 752's indemnification provision to parties who meet that test. Saljar argues that if we follow *Hullum* and *McCaughtry*, two cases that refer to control over the work site, we would

42

effectively impose a nondelegable duty on premises owners and occupiers because they "almost always have some general knowledge of where work is to be performed and will often have a representative occasionally observe the work." While we agree with the *Espinoza* court that Chapter 752 does not create a nondelegable duty upon premises owners or occupiers to be the party responsible for temporary work, 984 S.W.2d at 277 (citing cases holding that premises occupier does not have duty to insure that contractor's hired work is performed in safe manner), we do not agree with Saljar's proposed interpretation that only the person or entity who controls the "details of the work" in a contractor context may be a "party responsible" under the statute. Under Saljar's interpretation, a premises owner or occupier who directs that work be performed near power lines would have no responsibility to notify the utility before that work commences because the owner or occupier itself will not be performing the work or supervising or directing the day-to-day details of how the work is carried out. Instead, we conclude that determining who is the "party responsible" is a fact-specific inquiry that turns on who determines the location of the work and its proximity to a power line, an inquiry that in some cases will be informed by who controls the details of the work, such as the tools or equipment to be used and the manner in which they are to be used.

In many cases, the scope of the work to be done plays a role in identifying who is most likely to know whether the work will be performed near a power line. In *Hullum*, a Fifth Circuit case interpreting "party responsible" under Section 752.003's predecessor statute, the court concluded:

> Focusing liability on those parties who exercise some degree of control over the work site furthers the Texas legislature's policy of worker safety since *those parties determine where the work is to be done*; *those parties are the ones most likely to know whether or not the work will be performed near a power line*. Placing liability

43

on parties who do not exercise at least some control over the work site, on the other hand, lays the burden on parties who do not determine the location of the work site or its proximity to a power line. Indeed, placing liability on those with little or no control over the work site lessens the deterrent impact of the statute on those parties who do exercise control over the work site.

753 F.2d at 1337 (emphasis added) (analyzing Exxon's liability for worker's injury suffered while installing Exxon sign at independently owned service station and concluding that Exxon had no liability because it had no control over work site, had "no knowledge of the specific proposed location of the sign" at service station, and did not determine that sign should be placed near high-voltage power lines, and instead advised sign contractor to contact property lessor "to learn where the sign should be erected"). In *McCaughtry*, the court concluded that a fact issue existed over whether the premises owner exerted enough control to be held liable as a responsible party, even though the premises owner argued that it, like Exxon in *Hullum*, had hired a contractor to do the work and thus was not responsible for how or where the work was conducted. *McCaughtry*, 981 S.W.2d at 327. The premises owner, a homeowners association, had hired the contractor to refurbish its tennis court, including painting light standards that were approximately 25 feet high, the same height as the high-voltage power line that caused the plaintiff's injury, with the power line located approximately 9 to 9-½ feet from one of the light standards. *Id.* at 327. In addition to deciding that the light standards were to be painted, the homeowners association owned the premises and controlled access to the area around the tennis court and the tennis court itself, and its representatives were at the work site on occasion and observed the work. *Id.* at 335. As a result, the court concluded that the plaintiff had raised a fact issue about the level of control that the homeowners association exercised over the work site. *Id.* at 335-36.

44

*Espinoza* is one of the cases heavily relied on by Saljar to support its proposed jury instruction that the "person responsible" must have actually exercised control over the details of the contractor's work. 984 S.W.2d at 276-77. In *Espinoza*, the court concluded that the defendant cotton-farm owner, who had hired an independent contractor for the harvest season to harvest his cotton, was not liable as a "person responsible" when the contractor's employee was injured by a high-voltage line crossing over the cotton farm because the property owner did not direct the details of or directly supervise the harvesting work. *Id.* Although the court concluded that the property owner had established as a matter of law that he was not the responsible party under the statute, it also stated that "[u]nder other circumstances, we would have no trouble finding a fact question on the issue of whether a farmer hiring workers to harvest a crop was the person responsible for the activity, whether an independent farm labor contractor was involved or not." *Id.* at 277. Implicit in the court's decision is the idea that over a months-long harvest, occurring over many acres of land, a nonsupervisory property owner would have no knowledge of whether the work and the manner in which it was performed would put its contractor's employees in close proximity to high-voltage lines.

In contrast, Saljar made the *initial* determination to have the stucco work done on the overhang on the west side of the building within 6 feet of the power line. Saljar (identifying itself as the general contractor for the project) also submitted the inaccurate permit application to the City that did not disclose the full extent of the planned work or its proximity to the power line. While Romero controlled the details of how the stucco would be applied, he did not control whether the work would be done within 6 feet of the power line. Saljar directed that the work must be done in that area.

45

Consequently, under the facts present in this case, we conclude that the trial court correctly considered the intent of the statute to place "'liability for losses resulting from noncompliance with the notification and safety provisions' on the person responsible 'for having workers near a power line.'" *AEP*, 2008 WL 5210919, at *3 (quoting *Chavez*, 21 S.W.3d at 439). In the absence of a statutory definition for "person responsible," Question No. 8's language asking who "exercise[d] some degree of control of the work site within six feet of the high voltage overhead line" properly incorporated the statutory focus on responsibility for the proximity of the work to the power line. We hold that the trial court acted within its discretion by submitting Question No. 8 to the jury and by rejecting Saljar's proposed question and instruction, and we overrule Saljar's first issue.

**III. Sufficiency of the evidence supporting the judgment under either the standard stated in the jury charge or the standard suggested by Saljar**

In its three issues challenging the sufficiency of the evidence supporting the judgment, Saljar argues that the record contains no evidence that Saljar controlled the details of Romero's work, which would preclude a judgment under either its suggested "details of the work" test or under the "control of the work site within six feet of the high voltage overhead line" standard stated in the charge. The following facts relevant to Chapter 752 liability are undisputed: (1) the overhead power lines were high-voltage lines; (2) no one gave the City advance notice that work was going to be done within 6 feet of those lines; and (3) at its closest point, the west-wall overhang where Romero and his crew were to apply stucco was 5 feet, 5 inches from the power lines. As discussed above, under the facts of this case, to determine who was responsible for the temporary work, the relevant inquiry is who was responsible for having workers near the power lines.

46

Legally and factually sufficient evidence supports the jury's finding that Saljar is the party responsible. Although Saljar contends that there is no evidence in the record that it "controlled the details of the work" being done by Romero and thus could not have exercised control over the work site, we disagree. Saljar controlled the detail that matters here—the decision to have stucco applied on the west-wall overhang that was indisputably within 6 feet of the power lines.

The record contains sufficient evidence that Saljar knew the work would take place in the 5-foot, 5-inch space between the overhang and the power lines and that it directed Romero to work there. Both documentary evidence and testimony show that Saljar decided to renovate the nightclub, made the decisions about what renovations to do, and submitted a permit application to the City identifying itself as the "general contractor" for the improvements. However, Saljar never scheduled the pre-construction meeting with the City that was a condition of the permit and would have disclosed the true extent of the work. Saljar advised the premises owner's property manager of the planned renovations and coordinated the work of the various trades involved. Najjar testified that Saljar hired Romero specifically to install stucco and mesh on the overhang across the front of the building and around the west side of the building. Najjar met with Romero to show him the job site and what needed to be done. Najjar testified that even though the west-side overhang was not on the plan that Saljar gave to the City and to Romero when explaining the job to him, it was obvious when they were looking at the building because "[i]t's an overhang that go[es] around the building for a few feet, and this is what we were doing, the whole overhang, so it was obvious." Najjar was at the nightclub and saw the scaffolding being erected the day before the accident.[23]

---

[23] Although Najjar testified that when he saw the scaffolding that day, it was only halfway across the front of the building, Romero provided conflicting testimony that when the crew started

47

We hold that the evidence is sufficient to support the judgment under either the standard advocated by Saljar or the standard submitted to the jury, and we overrule Saljar's second, third, and fourth issues.

## CONCLUSION

Having overruled the City's issues, as well as Saljar's issues raised by its cross-appeal, we affirm the trial court's judgment.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Kelly

Affirmed

Filed:   June 24, 2021

---

erecting the scaffolding, they started at the short side of the building and then wrapped around toward the front door.  We assume that the jury "credited testimony favorable to the verdict and disbelieved testimony contrary to it." *City of Keller*, 168 S.W.3d at 819.